FILED
2026 Sep-22 PM 02:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **CITY OF BIRMINGHAM, ALABAMA,**<br><br>Plaintiff,<br><br>v.<br><br>**3M COMPANY; CB GARMENT, INC.; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; CORTEVA, INC.; DUPONT DE NEMOURS, INC.; EIDP, INC.; ELEVATE TEXTILES, INC.; FIRE-DEX, LLC; GLOBE MANUFACTURING COMPANY, LLC; HONEYWELL SAFETY PRODUCTS USA, INC.; INNOTEX CORP.; LION GROUP, INC.; MAJESTIC FIRE APPAREL, INC.; MILLIKEN & COMPANY; MORNING PRIDE MANUFACTURING L.L.C.; MSA SAFETY INCORPORATED; SAFETY COMPONENTS FABRIC TECHNOLOGIES, INC.; STEDFAST USA, INC.; SUNBELT FIRE, INC.; VIKING LIFE-SAVING EQUIPMENT (AMERICA), INC.; and W.L. GORE & ASSOCIATES, INC.,**<br><br>Defendants. | Civil Action No. ______________<br><br>**JURY TRIAL DEMANDED** |

**<u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>**

Plaintiff City of Birmingham, Alabama ("Plaintiff" or "the City") sues 3M Company ("3M"); CB Garment, Inc. ("CB Garment"); The Chemours Company ("Chemours"); The Chemours Company FC, LLC ("Chemours FC"); Corteva, Inc. ("Corteva"); DuPont de Nemours, Inc. ("DuPont de Nemours"); EIDP, Inc. ("EIDP"); Elevate Textiles, Inc. ("Elevate Textiles"); Fire-Dex, LLC ("Fire-Dex"); Globe Manufacturing Company, LLC ("Globe"); Honeywell Safety Products USA, Inc. ("Honeywell"); Innotex Corp. ("Innotex"); Lion Group, Inc. ("Lion");

Majestic Fire Apparel, Inc. ("Majestic"); Milliken & Company, individually and as successor in interest to Springfield LLC ("Milliken"); Morning Pride Manufacturing L.L.C. ("Morning Pride"); MSA Safety Incorporated ("MSA"); Safety Components Fabric Technologies, Inc. ("Safety Components"); Stedfast USA, Inc. ("Stedfast"); Sunbelt Fire, Inc. ("Sunbelt"); Viking Life-Saving Equipment (America), Inc. ("Viking"); and W.L. Gore & Associates, Inc. ("Gore") (collectively, "Defendants"). The City alleges the following based upon the investigation of counsel, information and belief, personal knowledge, and a review of publicly available information.

## INTRODUCTION

1. The City of Birmingham, Alabama is one of the largest municipalities in the State of Alabama and operates one of the largest career fire departments in the State. Among its governmental functions, the City operates the Birmingham Fire and Rescue Service ("BFRS"), a professional, career fire department that safeguards life, property, and natural resources through fire prevention, fire suppression, and emergency response. The City alone is responsible for funding the purchase, maintenance, laundering, storage, disposal, and replacement of BFRS's equipment, tools, and gear, and for acquiring, maintaining, and remediating the fire stations, apparatus bays, apparatus, lockers, laundering facilities, and other real and personal property in which that gear is used, laundered, and stored.

2. Over the course of decades, the City purchased and paid for specialized occupational personal protective equipment ("PPE")—including self-contained breathing apparatus, hoods, helmets, coats, pants, gloves, boots, reflective trim, and other multilayered PPE (collectively, "Turnout Gear")—that Defendants designed, formulated, treated, manufactured, assembled, marketed, distributed, and sold laden with highly toxic, carcinogenic, synthetic per- and

polyfluoroalkyl substances ("PFAS"). Turnout Gear so laden is referred to herein as "PFAS Turnout Gear."

3. PFAS are highly toxic, synthetic chemical compounds made of nearly indestructible chains of carbon and fluorine atoms. PFAS accumulate and concentrate in the human body with exposure. Once released into the environment, PFAS persist for a long, if not indefinite, period, earning them the nickname "forever chemicals." They are difficult to remediate, requiring specialized and costly protocols.

4. PFAS Turnout Gear is designed and manufactured with multiple sources of PFAS, including PFAS incorporated into the moisture barrier and PFAS-containing durable water repellent ("DWR") treatments applied to the outer shell of the gear. During ordinary and foreseeable use, these PFAS are not permanently confined to the materials in which they are incorporated. Rather, heat, perspiration, moisture, friction, repeated flexing and abrasion, laundering, aging, and degradation of the gear facilitate the release and migration of PFAS from the moisture barrier and from the PFAS-containing DWR treatments.

5. The PFAS in the PFAS Turnout Gear leach, shed, crumble, abrade, off-gas (a process in which a chemical is emitted in the form of a gas), and otherwise migrate out of the gear, thereby contaminating the City's real and personal property, including its fire stations, apparatus bays, fire apparatus, gear lockers and storage areas, laundering equipment and facilities, bunk rooms, furnishings, floors, drains, wastewater, and soil.

6. When exposed to heat, ultraviolet light, water, and routine wear and handling, PFAS off-gas, break down, and degrade into highly mobile and toxic particles and dust, further accelerating contamination of the City's property.

7. Because PFAS are chemically stable, water-soluble, and highly mobile, even small releases accumulate over time, creating persistent contamination that spreads through HVAC systems, wash water, runoff, and porous building materials. This migration is inherent to the chemical properties of PFAS-treated textiles and fluoropolymer membranes, meaning that contamination of the City's property occurs without misuse, damage, or extraordinary conditions.

8. The City purchased the PFAS Turnout Gear in order to protect the health and safety of its firefighters from the extreme conditions of firefighting activities, including the thermal, physical, environmental, and bloodborne pathogen hazards encountered during structural firefighting operations. The City would not have purchased the PFAS Turnout Gear, and would not have paid the prices it paid, had Defendants disclosed that the gear was laden with toxic PFAS that would migrate out of the gear and contaminate the City's property.

9. Instead of receiving protective equipment fit for that purpose, the City received, and paid for, a product that has released and continues to release toxic PFAS into the City's stations, apparatus, and equipment, requiring the City to incur substantial and ongoing costs for investigation, testing, remediation, decontamination, repair, retrieval, destruction, disposal, and replacement.

10. Over the past thirty to forty years, the leading cause of line-of-duty death in the fire service has changed from cardiac events to occupational cancer. That change directly corresponds to the timing of Defendants' addition of PFAS to PPE and their commercialization of PFAS Turnout Gear.

11. In 2022, the International Agency for Research on Cancer ("IARC"), the specialized cancer agency of the World Health Organization, convened a Working Group of international experts to evaluate the carcinogenicity of occupational exposure as a firefighter. Following its review of the

available epidemiological and mechanistic evidence, IARC classified occupational exposure as a firefighter as "carcinogenic to humans" (Group 1), its highest carcinogenic-hazard classification. IARC recognized that firefighters are routinely exposed to complex mixtures of carcinogenic and potentially carcinogenic substances, including PFAS, and that such substances may enter the body through inhalation, ingestion, and dermal absorption. IARC determined that there is sufficient evidence in humans that occupational exposure as a firefighter causes mesothelioma and bladder cancer, and limited evidence for cancers of the colon, prostate, and testis, melanoma of the skin, and non-Hodgkin lymphoma. IARC further found strong mechanistic evidence in exposed firefighters demonstrating multiple recognized characteristics of carcinogens, including genotoxicity, epigenetic alterations, oxidative stress, chronic inflammation, and receptor-mediated effects. See Int'l Agency for Research on Cancer, Occupational Exposure as a Firefighter, IARC Monographs on the Identification of Carcinogenic Hazards to Humans, Vol. 132 (2023).

12. The foregoing health science is pleaded here not as the City's injury, but because it establishes the hazardous and unreasonably dangerous character of the PFAS that Defendants placed in the City's Turnout Gear, the reason the contaminated gear must be retrieved, destroyed, and replaced rather than laundered and returned to service, and the reason the City's contaminated stations, apparatus, and equipment must be investigated, remediated, and in some instances replaced. The City asserts no claim in this action for personal injury, bodily harm, wrongful death, or medical monitoring, and seeks no recovery for any such harm suffered by any individual firefighter or other person.

13. Defendants manufactured, treated, assembled, marketed, distributed, and sold the PFAS Turnout Gear and placed it into the stream of commerce to be purchased by the City. PFAS are toxic chemicals, immunotoxic agents, and carcinogenic compounds that have posed and continue

to pose a serious risk of injury to property and to the health and safety of persons exposed to them through PFAS Turnout Gear use, laundering, handling, and storage.

14. Defendants, who knew for decades that PFAS posed major health and environmental risks, through a common enterprise (the "PFAS Cover-Up Enterprise"), designed, treated, assembled, marketed, sold, and otherwise supplied PFAS Turnout Gear to the City without disclosing the toxicity of that gear or the propensity of the PFAS within it to migrate and contaminate surrounding property. For decades, Defendants suppressed adverse scientific research regarding PFAS and made misleading statements to fire departments, standard-setting bodies, regulators, and the public about the safety of the PFAS in Turnout Gear.

15. Defendants, fraudulently concealing adverse scientific research, failed to disclose to the City and to other public entities that use Turnout Gear that the PFAS in Turnout Gear are dangerous to health, property, and the environment. Instead, Defendants collaborated to conceal the truth, and such concealment was a common purpose of the PFAS Cover-Up Enterprise.

16. The nature of the Turnout Gear industry, including its standards and certification processes, required Defendants to share information, agree on materials, and cooperate in the design, manufacture, promotion, sale, and commercialization of finished Turnout Gear. Defendants used that cooperation, and their influence within the standard-setting process, to entrench PFAS-containing components as a practical precondition to certification and sale.

17. Facing mounting peer-reviewed studies, increased public awareness, demands for transparency and disclosure, and growing state-law prohibitions on PFAS in Turnout Gear, Defendants have begun to acknowledge publicly that PFAS, especially in the concentrations included in Turnout Gear, are unreasonably dangerous, and have begun shifting to PFAS-free Turnout Gear.

18. As textile manufacturer Milliken has stated, "Milliken saw the writing on the wall and got to work." The "writing on the wall" Milliken referred to was "[t]he growing chorus of concern over the last several years from firefighters, lawmakers, insurers, and environmentalists[, which] has all but guaranteed that use of PFAS was going away sooner rather than later."

19. 3M announced that it would halt production of PFAS chemicals and work to phase out PFAS in all its products by the end of 2025. Upon information and belief, 3M would not have made this announcement unless it knew that safer alternatives to PFAS in Turnout Gear existed.

20. At least as of 2025, PFAS-free Turnout Gear is available in the marketplace that complies with the water-repellent and heat-resistive characteristics and industry standards for firefighter PPE embodied in applicable National Fire Protection Association ("NFPA") standards. Such PFAS-free Turnout Gear would have been available far earlier had Defendants directed their efforts toward making it available, rather than toward suppressing information regarding PFAS and preserving technical requirements that only PFAS-containing materials could satisfy.

21. Toxic PFAS contamination of the City's property is ongoing and escalating. Until the PFAS Turnout Gear is retrieved, destroyed, and disposed of, and the contaminated property is effectively remediated, the contamination of the City's property will continue and will potentially escalate with continued use and handling.

22. The City brings this action to recover its own damages—the costs of investigating, testing, remediating, decontaminating, repairing, and replacing its contaminated real and personal property; the costs of retrieving, destroying, and disposing of the PFAS Turnout Gear; the costs of replacing that gear with Turnout Gear fit for its intended purpose; the amounts it paid to Defendants for a product Defendants knew to be unreasonably dangerous and unfit; and such other damages as are alleged herein.

## PARTIES

### I. Plaintiff

23. Plaintiff City of Birmingham, Alabama is a municipal corporation organized and existing under the laws of the State of Alabama, located in Jefferson County, Alabama, within this District and Division.

24. The City operates BFRS, which safeguards the life, property, and safety of the residents of Birmingham through fire prevention, fire suppression, and emergency response services. The City is responsible for funding the purchase, maintenance, laundering, storage, disposal, and replacement of BFRS's equipment, tools, and Turnout Gear, and owns and maintains the fire stations, apparatus bays, apparatus, lockers, laundering equipment, and other real and personal property at which that Turnout Gear is used, laundered, and stored.

25. During the relevant period, the City purchased or otherwise acquired Turnout Gear that Defendants designed, formulated, treated, manufactured, assembled, marketed, distributed, applied, sold, or placed in the stream of commerce. The outer shell, moisture barrier, thermal liner, reflective trim, adhesives, seam tapes, and other components of the Turnout Gear the City purchased or acquired contained PFAS or PFAS-treated textiles or components.

### II. Defendants

26. For decades, PFAS Turnout Gear has been designed, tested, manufactured, treated, assembled, certified, marketed, distributed, and sold through the collective, organized, and highly interdependent contributions of Defendants. Each Defendant contributed a necessary and essential component, material, chemical, treatment, certification, or related service without which the PFAS Turnout Gear could not have been produced, certified, sold, acquired, or introduced into the stream of commerce. Each Defendant knew and intended that its products and services would be

combined to create the finished PFAS Turnout Gear purchased by the City and other fire departments for use by their firefighters in Alabama.

27. As used herein, the following defined groups of Defendants have the following meanings on information and belief:

a. "PFAS Chemical Finish Defendants" means 3M, EIDP, DuPont de Nemours, Chemours, Chemours FC, and Corteva.

b. "Component Manufacturer Defendants" means Elevate Textiles, Gore, Milliken, Safety Components, and Stedfast.

c. "Assembler Defendants" means CB Garment, Fire-Dex, Globe, Honeywell, Innotex, Lion, Majestic, Morning Pride, and Viking.

d. "Distributor Defendant" means Sunbelt.

e. "DuPont Defendants" means EIDP, DuPont de Nemours, Chemours, Chemours FC, and Corteva.

28. These defined groups are used for convenience of pleading only. Each allegation directed to a defined group is asserted against each Defendant within that group individually, and no Defendant's liability is premised solely upon its membership in a defined group.

29. The City has limited the Defendants named in this action to those Defendants that, upon information and belief and based upon the investigation of counsel, designed, formulated, treated, manufactured, assembled, certified, or sold the Turnout Gear and the PFAS-containing components and PFAS Chemical Finishes that the City purchased and used.

### *A. PFAS Chemical Finish Defendants*

30. The PFAS Chemical Finish Defendants design, formulate, manufacture, market, and sell the PFAS performance chemicals used in high-hazard protective clothing, including durable water-

and oil-repellent treatments, fluorochemical finishes, coatings, surfactants, adhesives, fluoropolymer dispersions, membrane coatings, adhesion promoters, finishing sprays, and repellency boosters, as well as other PFAS performance chemicals applied to the fabrics, textiles, adhesives, reflective trim, and assembled Turnout Gear (collectively, “PFAS Chemical Finishes”). Those treatments were intentionally applied to impart resistance to water, oils, chemicals, and other liquids encountered during firefighting operations.

31. The PFAS Chemical Finish Defendants make the PFAS molecules—including fluorotelomer alcohols (“FTOHs”), fluorinated acrylates, perfluorinated surfactants, and side-chain fluorinated polymers—that are the building blocks of the PFAS Chemical Finishes.

32. All PFAS Turnout Gear purchased or acquired by the City contains PFAS Chemical Finishes designed, manufactured, marketed, sold, or placed in the stream of commerce by at least one of the PFAS Chemical Finish Defendants.

33. The PFAS Chemical Finish Defendants invented, developed, and commercialized PFAS Chemical Finishes into an essential component of the billion-dollar Turnout Gear industry.

34. Defendant 3M Company (“3M”), formerly known as Minnesota Mining and Manufacturing Company, is a Delaware corporation with its principal place of business in St. Paul, Minnesota, and does business throughout the United States, including in Alabama.

35. 3M’s PFAS Chemical Finishes were among the earliest used in Turnout Gear and included perfluorooctane sulfonate (“PFOS”), PFOS-based surfactants and repellents, and legacy Scotchgard fluorochemical repellents. 3M was the leading manufacturer and supplier of PFAS Chemical Finishes until 2002 and remains a leading manufacturer of PFAS tapes and adhesives.

36. In addition to PFAS Chemical Finishes, 3M invented, designed, manufactures, markets, and sells 3M Scotchlite Reflective Tape, which contains PFAS and is used on Turnout Gear purchased, acquired, or used by the City.

37. 3M also operates and has long operated a chemical manufacturing facility in Decatur, Alabama, at which it manufactured PFAS, and at which it took internal protective measures with respect to its own employees that it did not disclose to purchasers or users of PFAS-containing products.

38. Defendant EIDP, Inc. ("EIDP"), formerly known as E.I. du Pont de Nemours and Company, is a Delaware corporation with its principal place of business in Wilmington, Delaware, and does business throughout the United States, including in Alabama.

39. Defendant DuPont de Nemours, Inc. ("DuPont de Nemours") is a Delaware corporation with its principal place of business in Wilmington, Delaware, and does business throughout the United States, including in Alabama.

40. Defendant The Chemours Company ("Chemours") is a Delaware corporation with its principal place of business in Wilmington, Delaware, and does business throughout the United States, including in Alabama. In 2015, EIDP spun off its performance chemicals business as a new, publicly traded company, Chemours. In connection with that transfer, Chemours assumed certain EIDP assets and liabilities, including business lines and liabilities relating to the design, manufacture, marketing, distribution, and sale of the PFAS that are the subject of this action.

41. Defendant The Chemours Company FC, LLC ("Chemours FC") is a Delaware limited liability company with its principal place of business in Wilmington, Delaware, and does business throughout the United States, including in Alabama. Chemours FC is a subsidiary of Chemours and manufactures PFAS that are the subject of this action. Upon information and belief, the sole

member of Chemours FC is Chemours, a Delaware corporation with its principal place of business in Delaware.

42. Defendant Corteva, Inc. ("Corteva") is a Delaware corporation with its principal place of business in Indianapolis, Indiana, and does business throughout the United States, including in Alabama. In 2019, DuPont de Nemours spun off its agricultural business as a new, publicly traded company, Corteva, which holds EIDP as a subsidiary. In connection with these transfers, Corteva assumed certain EIDP assets and liabilities, including business lines and liabilities relating to the design, manufacture, marketing, distribution, and sale of the PFAS that are the subject of this action.

43. In 2002, following the phase-out of PFOS, EIDP replaced 3M as the dominant supplier of fluorotelomer alcohols, C6 fluorotelomer acrylates, Zonyl fluorochemical repellents, and Capstone repellents, all of which are PFAS.

### *B. Component Manufacturer Defendants*

44. The Component Manufacturer Defendants design, manufacture, treat, market, and sell PFAS-containing fabrics and other components of Turnout Gear, including PFAS-containing and DWR-coated thermal liners, outer shells, and moisture barriers. The moisture barrier, located between the inner thermal liner and the outer shell, has commonly incorporated polytetrafluoroethylene ("PTFE") or expanded polytetrafluoroethylene ("ePTFE"), a highly fluorinated polymer within the broad class of PFAS, to provide resistance to water and other liquids while maintaining the performance characteristics required of structural firefighting garments.

45. The PFAS Turnout Gear purchased or acquired by the City contains PFAS-containing fabrics and components designed, manufactured, treated, marketed, sold, or placed in the stream of commerce by at least one of the Component Manufacturer Defendants.

46. Defendant Elevate Textiles, Inc. ("Elevate Textiles") is a Delaware corporation with its principal place of business in Charlotte, North Carolina, and does business throughout the United States, including in Alabama. Elevate Textiles is the corporate parent of Defendant Safety Components.

47. Defendant W.L. Gore & Associates, Inc. ("Gore") is a Delaware corporation with its principal place of business in Newark, Delaware, and does business throughout the United States, including in Alabama. Gore designs, manufactures, markets, and sells ePTFE moisture-barrier laminates used in Turnout Gear.

48. Defendant Milliken & Company, individually and as successor in interest to Springfield LLC ("Milliken"), is a Delaware corporation with its principal place of business in Spartanburg, South Carolina, and does business throughout the United States, including in Alabama.

49. Defendant Safety Components Fabric Technologies, Inc. ("Safety Components") is a Delaware corporation with its principal place of business in Greenville, South Carolina, does business throughout the United States, including in Alabama, and is a subsidiary of Defendant Elevate Textiles.

50. Defendant Stedfast USA, Inc. ("Stedfast") is a Delaware corporation with its principal place of business in Piney Flats, Tennessee, and does business throughout the United States, including in Alabama. Stedfast designs, manufactures, markets, and sells moisture-barrier laminates used in Turnout Gear.

51. Each Component Manufacturer Defendant designs, manufactures, treats, markets, and sells PFAS-containing Turnout Gear components for use in final Turnout Gear assembly, including moisture barriers, thermal liners, outer shells, and other fabrics.

### *C. Assembler Defendants*

52. The Assembler Defendants combine component materials to create the finished Turnout Gear that they sell and introduce into the stream of commerce under their respective brand names. They source outer shells, moisture barriers, and thermal liners from other producers in the supply chain; cut, sew, laminate, and assemble the components; apply additional treatments or finishes, including PFAS Chemical Finishes; brand the Turnout Gear under their own names; and certify the finished Turnout Gear to NFPA standards.

53. Although the outer shell, moisture barrier, and thermal liner already contain PFAS, the Assembler Defendants apply additional PFAS Chemical Finishes after cutting and sewing. For example, the Assembler Defendants apply PFAS Chemical Finishes to the outer shell and to reinforcements in order to enhance repellency and increase stain, oil, and chemical resistance.

54. The Assembler Defendants add extra concentrated applications of PFAS Chemical Finishes; apply adhesives and seam tapes to seal moisture-barrier seams and reinforce stress points; and bond reflective trim, bonding patches, labels, and structural reinforcements, including at the knees, elbows, cuffs, and pockets.

55. The PFAS adhesives used in assembly contain fluorinated acrylic polymers, fluorotelomer-based surfactants, PFAS-modified urethanes, and PTFE-filled adhesive film.

56. The Assembler Defendants apply PFAS-based repellency boosters and PFAS-based anti-static or anti-soiling sprays to the finished Turnout Gear, and use PFAS-containing lubricants on sewing equipment.

57. The PFAS glues, bonding agents, and lamination adhesives used by the Assembler Defendants during assembly are not reported in fabric material safety data sheets but nevertheless substantially increase the total PFAS load in the finished Turnout Gear.

58. The PFAS Turnout Gear purchased or acquired by the City was assembled, branded, certified, and sold by at least one of the Assembler Defendants.

59. Defendant CB Garment, Inc., doing business as CrewBoss ("CB Garment"), is a corporation with its principal place of business in Eugene, Oregon, and does business throughout the United States, including in Alabama. CB Garment manufactures firefighter protective clothing under the CrewBoss brand. Upon information and belief, CB Garment has operated as a division of WS Acquisition, LLC, which also operates the Western Shelter Systems business, and CrewBoss joined the Western Protective Solutions group of companies in or about 2023.

60. Defendant Fire-Dex, LLC ("Fire-Dex") is an Ohio limited liability company with its principal place of business at 780 South Progress Drive, Medina, Ohio 44256, and does business throughout the United States, including in Alabama.

61. Defendant Globe Manufacturing Company, LLC ("Globe") is a limited liability company with its principal place of business in Pittsfield, New Hampshire, and does business throughout the United States, including in Alabama. Globe manufactures firefighter protective clothing and footwear at facilities in Pittsfield, New Hampshire; Ada, Oklahoma; and Auburn, Maine, and operates a protective clothing cleaning and repair facility in Fairfax, Virginia. Upon information and belief, Globe is a subsidiary of Globe Holding Company, LLC, which Defendant MSA acquired on or about July 31, 2017 in an all-cash transaction valued at approximately $215 million, and Globe is therefore an indirect subsidiary of Defendant MSA.

62. Defendant Honeywell Safety Products USA, Inc. ("Honeywell") is a Delaware corporation with its principal place of business in Charlotte, North Carolina, and does business throughout the United States, including in Alabama.

63. Defendant Innotex Corp. ("Innotex") is a corporation organized under the laws of Canada with its principal place of business in Quebec, Canada, and does business throughout the United States, including in Alabama. Innotex maintains a United States facility in Ohatchee, Alabama, where it manufactures and treats textiles with the PFAS that are the subject of this action.

64. Defendant Lion Group, Inc. ("Lion") is an Ohio corporation with its principal place of business in Dayton, Ohio, and does business throughout the United States, including in Alabama.

65. Defendant Majestic Fire Apparel, Inc. ("Majestic") is a Pennsylvania corporation with its principal place of business in Lehighton, Pennsylvania, and does business throughout the United States, including in Alabama.

66. Defendant Morning Pride Manufacturing L.L.C. ("Morning Pride"), doing business as Honeywell First Responder Products, is a limited liability company with its principal place of business in Dayton, Ohio, and does business throughout the United States, including in Alabama. Morning Pride has manufactured firefighter turnout gear since 1921 and markets structural turnout gear under the Morning Pride brand, including the Morning Pride TAILS and VIPER ensembles. Upon information and belief, Honeywell acquired Morning Pride in or about 2008, and Morning Pride has since operated as a Honeywell business under the name Honeywell First Responder Products.

67. Defendant MSA Safety Incorporated ("MSA") is a Pennsylvania corporation with its principal place of business in Cranberry Township, Pennsylvania, does business throughout the United States, including in Alabama, and is the corporate parent of Defendant Globe.

68. Defendant Viking Life-Saving Equipment (America), Inc. ("Viking") is a Delaware corporation with its principal place of business in Medley, Florida, and does business throughout the United States, including in Alabama.

69. Each Assembler Defendant assembles, brands, certifies, and sells finished Turnout Gear using PFAS-containing components sourced from the Component Manufacturer Defendants and PFAS Chemical Finishes sourced from the PFAS Chemical Finish Defendants.

### *D. Distributor Defendant*

70. The Distributor Defendant solicits, markets, sells, and distributes finished Turnout Gear to fire departments and end users in Alabama. It prepares and submits bids, catalogs, specifications, and product literature to fire departments; recommends particular gear configurations, shells, and moisture barriers; and serves as a point of sale and a principal source of product information for municipal purchasers, including the City.

71. Defendant Sunbelt Fire, Inc. ("Sunbelt") is a corporation organized under the laws of Georgia with its principal place of business in Fairhope, Alabama, and does business throughout the United States, including in Alabama. Sunbelt solicited, marketed, sold, and distributed PFAS Turnout Gear to the City and to other fire departments in Alabama.

### *E. Corporate Relationships, Successor Liability, and Agency*

72. Chemours and Chemours FC are liable for the conduct and liabilities of EIDP relating to the PFAS at issue. In 2015, EIDP transferred its performance chemicals business—including the business lines, assets, personnel, know-how, customer relationships, and liabilities associated with the design, manufacture, marketing, and sale of the PFAS Chemical Finishes at issue—to Chemours. Chemours expressly assumed those liabilities; continued the same business, at the same facilities, using the same equipment, personnel, and management, and serving the same customers; and held itself out to the market as the continuation of that business. Upon information and belief, the consideration exchanged in connection with that transfer was inadequate in light of the PFAS liabilities transferred, and the transfer was structured with the purpose and effect of insulating

EIDP's retained assets from those liabilities. Chemours and Chemours FC are therefore liable for those liabilities as express assumers, as mere continuations of the transferred business, as de facto merger successors, and as transferees of a transfer made without adequate consideration.

73. DuPont de Nemours and Corteva are likewise liable for the conduct and liabilities of EIDP relating to the PFAS at issue. In 2019, DuPont de Nemours separated its businesses and distributed EIDP to Corteva. In connection with those transactions, DuPont de Nemours and Corteva allocated and assumed EIDP liabilities, including liabilities relating to the PFAS at issue, and agreed to indemnification and cost-sharing arrangements with respect to PFAS liabilities. Upon information and belief, those transactions were structured with the purpose and effect of separating the PFAS liabilities from the assets and business operations that generated them.

74. MSA is liable for the conduct of Globe. Upon information and belief, MSA acquired Globe in 2017 and thereafter directed and controlled Globe's product design, materials sourcing, regulatory and standard-setting participation, marketing, and communications with fire departments; marketed Globe-branded Turnout Gear as an MSA product line; and derived the revenue from Globe's sales of PFAS Turnout Gear. Globe acted as MSA's agent, and MSA acted as principal, with respect to the conduct alleged herein.

75. Elevate Textiles is liable for the conduct of Safety Components. Upon information and belief, Elevate Textiles directed and controlled Safety Components' product design, materials sourcing, marketing, and communications concerning PFAS content, and derived the revenue from Safety Components' sales of the PFAS-containing components at issue. Safety Components acted as the agent of Elevate Textiles, and Elevate Textiles acted as principal, with respect to the conduct alleged herein.

76. Upon information and belief, Honeywell is liable for the conduct of Morning Pride, and Morning Pride acted as Honeywell's agent, with respect to the design, manufacture, assembly, certification, marketing, and sale of the Morning Pride-branded Turnout Gear at issue.

***F. Product Identification***

77. The City's procurement, purchasing, bid, invoice, inventory, and gear-tracking records, together with the labels, identification tags, and certification markings affixed to the Turnout Gear in the City's possession, identify the specific Turnout Gear that the City purchased, the brand and model of that gear, the outer shell and moisture-barrier materials incorporated into it, the PFAS Chemical Finishes applied to it, and the Defendant or Defendants that designed, formulated, treated, manufactured, assembled, certified, distributed, or sold each such product and component.

78. Each Defendant named herein designed, formulated, treated, manufactured, assembled, certified, distributed, or sold PFAS Turnout Gear, or a PFAS-containing component or PFAS Chemical Finish incorporated into PFAS Turnout Gear, that was purchased, acquired, used, laundered, stored, or otherwise encountered by the City and that is identified in the records and markings described in the preceding paragraph.

79. To the extent the identity of the manufacturer or supplier of a particular component or PFAS Chemical Finish incorporated into Turnout Gear purchased by the City is not ascertainable from the City's own records or from the markings on the gear, that information is within the exclusive possession, custody, or control of Defendants and their suppliers, and the City will identify such components and suppliers with further particularity upon obtaining discovery of Defendants' supply, sourcing, bill-of-materials, certification, and sales records.

80. Each Defendant is responsible in some manner for the acts and omissions alleged herein, and each Defendant proximately caused the injuries to the City alleged herein.

81. Each Defendant derived substantial revenue from the Turnout Gear, components, materials, or chemicals that are the subject of this action. Defendants designed, developed, tested, manufactured, treated, packaged, promoted, marketed, advertised, certified, distributed, and sold that Turnout Gear and those components, materials, and chemicals throughout the United States, including in Alabama, and thereby caused harm to the City.

82. Defendants expected or should have expected their actions to have consequences throughout the United States, including in Alabama, and purposefully availed themselves of the privilege of conducting activities in Alabama, thus invoking the benefits and protections of Alabama law.

## JURISDICTION AND VENUE

83. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the City asserts claims arising under the laws of the United States, namely the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 ("RICO"). See 18 U.S.C. § 1964(c); 28 U.S.C. § 1331.

84. This Court has supplemental jurisdiction over the City's state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the City's RICO claims that they form part of the same case or controversy under Article III of the United States Constitution. The state-law claims arise from the same nucleus of operative fact—Defendants' design, manufacture, treatment, assembly, certification, marketing, concealment, and sale of PFAS Turnout Gear to the City—as the RICO claims.

85. This Court also has jurisdiction over the City's RICO claims pursuant to 18 U.S.C. § 1965(a).

86. This Court has personal jurisdiction over each Defendant. Each Defendant has purposefully directed its activities at Alabama by designing, manufacturing, treating, assembling, certifying, marketing, distributing, soliciting, or selling PFAS Turnout Gear or its PFAS-containing components and finishes for sale and use in Alabama; by transacting business in Alabama; by maintaining agents, facilities, or representatives in Alabama; or by committing overt acts in furtherance of the conduct alleged herein that were directed at, or had the effect of causing injury to, persons and entities located in and doing business in Alabama. The City's claims arise out of and relate to those Alabama-directed activities.

87. This Court additionally has personal jurisdiction over each Defendant pursuant to 18 U.S.C. § 1965(b) and (d), which authorize nationwide service of process in civil RICO actions. The ends of justice require that Defendants, who reside in multiple districts and in Canada, be brought before this Court in a single action, because no single district has personal jurisdiction over all Defendants under state long-arm principles, and because the PFAS Cover-Up Enterprise alleged herein operated across districts and national borders.

88. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the City's claims occurred in this District, including the solicitation, sale, and delivery of PFAS Turnout Gear to the City, the City's purchase of and payment for that gear, the City's use, laundering, and storage of that gear, and the contamination of the City's real and personal property located in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(b)(3) and (c) and 18 U.S.C. § 1965(a) and (b).

89. This action is brought in the Southern Division of this District because the City, its fire stations, its apparatus, and the contaminated property at issue are located in Jefferson County, Alabama.

## FACTUAL ALLEGATIONS

90. As used in this section and throughout this Complaint, "DuPont" refers to Defendant EIDP, Inc. and its predecessor E.I. du Pont de Nemours and Company, and, with respect to the conduct, business lines, and liabilities transferred in the 2015 and 2019 transactions described above, to the DuPont Defendants collectively.

### I. The History of PFAS, Turnout Gear, and Their Effects on Human Health and the Environment

91. PFAS are a class of chemical compounds, which consist of chains of carbon and fluorine that, due to the strength of the carbon-fluorine bonds, are highly resistant to being broken down in nature.

92. PFAS do not exist naturally in the environment. PFAS, which are formed by artificially connecting carbon and fluorine, are known for their strength, water resistance, grease protection, and stain resistance.

93. In 1938, DuPont invented an early PFAS chemical that in the mid-1940s was coined "Teflon." In the 1940s, DuPont and 3M produced PFAS on a commercial scale. Since the 1940s and 1950s, PFAS have been widely used in industrial and consumer products. The chemical stability, thermal stability, and water-repellent characteristics of PFAS have led to their use in a wide range of products. By 1948, DuPont was producing over 900 tons of PTFE per year. By the 1950s, DuPont and 3M commercialized PFAS chemicals into very lucrative "performance chemicals." PFAS have been used in a broad range of industrial and consumer products, including firefighter Turnout Gear.

94. During all relevant time, Defendants DuPont and 3M collaborated in the creation, development, manufacture, and commercialization of PFAS molecules and performance chemistries, sharing research, development, critical data, investigative results, performance

measures, reports, and other highly pertinent information related to the performance, impact, and safety of PFAS.

95. PFAS Turnout Gear contains substantially higher concentrations of PFAS than any other comparable industrial, occupational, or consumer apparel, gear, and PPE.

96. PFAS Turnout Gear has particularly high concentrations of toxic PFAS in the fluoropolymer moisture barriers, PFAS-based water and oil repellants, PFAS-treated aramid blends and aramid fabrics, and PFAS-containing adhesives and membranes.

97. PFAS concentrations in fluorinated polymer-treated textiles have been shown to increase with weathering.

98. Defendants add PFAS to Turnout Gear in high concentrations and in multiple layers. They do so with the knowledge that the added PFAS are highly toxic and carcinogenic and would not remain contained in the PFAS Turnout Gear, but would leach into the skin of firefighters through transdermal absorption when worn, would off-gas into the air and be inhaled by firefighters and exposed persons, would abrade and crumble onto property and be inhaled or ingested by firefighters and other exposed persons, and would otherwise migrate and contaminate the surrounding environment and property.

99. PFAS in the PFAS Turnout Gear do not remain contained or stable; rather their concentrations and migration increase dramatically when exposed to physical stressors associated with firefighting activities, such as during abrasion, heat, and weathering.

100. PFAS-migration science shows that PFAS do not remain bound within the Turnout Gear; instead, they continuously shed, volatilize, abrade, and leach from the Turnout Gear during normal use, storage, handling, and laundering.

101. Once released, PFAS bind weakly to surfaces and readily contaminate station floors, gear rooms, apparatus bays, fabrics, drains, wastewater, dust, and soil.

102. PFAS are known immunotoxins and carcinogenic compounds that cause multiple harmful effects, including environmental and property contamination and a substantial risk of injury to the health and safety of humans and other animals.

103. In recent decades, researchers, environmentalists, and government agencies have all raised concerns regarding the persistence and toxicity of PFAS, as well as their ability to be absorbed and bioaccumulate in the human body.

104. Such concerns have prompted a dramatic increase in epidemiological studies regarding the adverse effects of PFAS exposure on human health.

105. Generally accepted peer-reviewed scientific research found that PFAS exposure, even in minute quantities, is considered hazardous to human health, and is linked to multiple serious adverse health effects in humans, including various cancers, tumors, liver damage, immune system and endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, and pregnancy-induced hypertension.

106. PFAS have been formally recognized as hazardous to the environment and human and animal health and safety by multiple U.S. and international organizations, including the U.S. Environmental Protection Agency ("EPA"), Agency for Toxic Substances and Disease Registry, National Institute of Environmental Health Sciences, Environmental Council of the States, the European Environmental Agency, Stockholm Convention on Persistent Organic Pollutants (to which the United States is a signatory), and the National Institute of Standards and Technology ("NIST").

107. The International Agency for Research on Cancer has classified one type of PFAS—perfluorooctanoic acid ("PFOA")—as "carcinogenic to humans" based on strong evidence that it has some of the key properties of a carcinogen in people who are exposed to it and evidence it can cause cancer in lab animals.

108. In September 2022, the EPA initiated a proposed rulemaking to designate PFOA and PFOS as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act. In support, the EPA stated that "evidence indicates that these chemicals may present a substantial danger to public health or welfare or the environment[.]"

109. The EPA classified both PFOA and PFOS as likely human carcinogens. In addition, the EPA concluded that there is no safe level of PFOA or PFOS exposure to humans.

110. In April 2024, the EPA announced the final National Primary Drinking Water Regulation to establish legally enforceable levels, called Maximum Contaminant Levels, for six PFAS in drinking water. The EPA also finalized health-based, non-enforceable Maximum Contaminant Level Goals ("MCLGs") for those six PFAS. Notably, the MCLGs for both PFOA and PFOS were listed as "Zero."

111. The World Health Organization, International Agency for Research on Cancer has classified PFOA as "carcinogenic to humans" based on strong evidence that it has some of the key properties of a carcinogen in people who are exposed to it and sufficient evidence it can cause cancer in lab animals.

112. In 2022, the California Office of Environmental Health Hazard Assessment listed PFOA as a chemical known to the state of California to cause cancer.

113. In 2023, the Yale School of Public Health conducted a PFAS study, in which two PFAS chemicals "spurred cancer cells in the lab to migrate to new positions," an indication that the

chemicals could contribute to cancer metastasis in living organisms. PFAS "chemicals show up in the blood of newborns, of people living in sub-Arctic Indigenous communities, in fish and mussels, even birds' eggs." No level of PFAS in the body is considered safe, and they have been linked to a litany of health problems, including cancers.

114. Thus, the scientific community, the federal government, the World Health Organization, and the State of California have raised significant concerns about PFAS, due to their persistence, prevalence, and toxicity.

115. Defendants designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, and sold PFAS Turnout Gear.

116. 3M, DuPont, and all relevant Defendants expected their PFAS to reach their ultimate users without substantial change in the condition in which they were designed and manufactured, and they did so reach the City and its firefighters.

117. All Defendants expected their PFAS-containing materials to reach fire departments and firefighters without substantial change in the condition in which they were designed and manufactured, and they did so reach the City and its firefighters.

## II. PFAS Migrate Out of Turnout Gear and Contaminate Fire Department Property

118. At the 2022 International Association of Fire Fighters ("IAFF") Fallen Fire Fighter Memorial, almost 75% of the names added to the wall (348 out of 469) were members who had died from occupational cancer.

119. There are established links between PFAS and testicular cancer, kidney cancer, thyroid cancer, liver cancer, and prostate cancer. These are cancers that firefighters contract more than the general public.

120. A 2020 study conducted by a group of physicists at the University of Notre Dame (the "Peaslee study"), found significant quantities of PFAS in every layer of both new (i.e., still in the original packaging) and used Turnout Gear collected from firefighters across the United States.

121. "Startlingly, a garment-to-hand transfer of total fluorine . . . was also observed when researchers simply manipulated the textiles in [the] laboratory," which strongly supports the premise that side-chain fluoropolymers and the PFAS they bind release to the environment upon wear.

122. Lead researcher Graham Peaslee commented that firefighter Turnout Gear is composed of "the most highly fluorinated textiles [he had] ever seen" and that the levels of PFAS in the Turnout Gear means the firefighters are "swimming in a sea of [PFAS]. Those numbers for scientists are scarily high."

123. Other peer-reviewed scientific research has confirmed that elevated blood levels of PFAS have been found in firefighters, with dermal absorption through direct contact between the firefighters' skin and PFAS Turnout Gear being "a key exposure route." Extensive scientific research and studies have demonstrated that firefighter exposure through dermal absorption, inhalation, and ingestion from the intended and expected use, cleaning, and storage of the gear presents a substantial risk of injury to the health and safety of the firefighters so exposed, including the risk of contracting cancer and other serious diseases.

124. Multiple biomonitoring studies show that firefighters often have substantially higher levels of certain PFAS in serum than the general population.

125. Turnout Gear is increasingly recognized as a potential source of PFAS exposure amongst firefighters.

126. In 2021, the U.S. Congress responded to growing concerns that soaring rates of occupational cancers among firefighters may be directly caused by PFAS exposure from PFAS Turnout Gear by directing NIST to study the prevalence of PFAS in Turnout Gear.

127. In or around 2022, a group of students at UC Berkeley's Center for Green Chemistry, in partnership with IAFF, conducted a semester-long study into safer alternatives to PFAS in Turnout Gear and offered multiple alternative recommendations for manufacturers. For example, the students concluded that polyethylene laminate could be used as a potential alternative to PTFE in the middle moisture barrier of Turnout Gear.

128. A pair of NIST studies, released in May 2023 and January 2024, found that Turnout Gear not only contains cancer-causing PFAS, but also that Turnout Gear releases even more PFAS when subject to simulated wear and tear.

129. In September 2024, the NFPA introduced NFPA 1970-2025, restricting the use of PFAS in Turnout Gear and requiring special testing and certification.

130. In 2024, the states of Massachusetts and Connecticut passed laws (1) requiring notice beginning in 2025 to any person, local government, or state agency as to whether PFAS is contained in firefighter PPE being sold in either state; and (2) beginning on January 1, 2027, in Massachusetts, and in 2028 in Connecticut, banning the sale of any firefighter PPE containing PFAS.

131. On August 15, 2025, Illinois enacted the Deputy Chief Pete Bendinelli PFAS PPE Act—named for longtime Calumet City Firefighters Local 621 member Pete Bendinelli, who died from cancer in 2025—requiring notices of PFAS in Turnout Gear beginning in 2026 and prohibiting the manufacture, sale, and distribution of PFAS Turnout Gear beginning in 2027.

132. Illinois Rep. Mike Kelly, who co-sponsored the newly enacted Illinois state law, explained: "Little did we know that the actual gear designed to protect us is actually killing us."

133. The Illinois PFAS Reduction Act is another worker-protection and cancer-prevention measure that acknowledges the toxicity of PFAS, the unnecessary inclusion of PFAS in Turnout Gear, the need for transparency from Defendants related to PFAS in their Turnout Gear, enhanced enforcement authority for the attorney general, and expanded Illinois Environmental Protection Agency authority. PFAS Reduction Act, 415 Ill. Comp. Stat. 170/5, 170/20 (2025), as amended by Pub. Act 104-221.

134. In May 2024, San Francisco passed an ordinance banning PFAS in Turnout Gear and requiring replacement by June 2026. San Francisco completed the first purchase of 1,100 sets of non-PFAS turnout gear in December 2025, which will provide one set for every frontline suppression member. The cost of the new non-PFAS turnout gear exceeded $4.5 million dollars.

135. In announcing the purchase of the non-PFAS turnout gear, San Francisco Fire Chief Dean Crispen underscored the importance of providing PFAS-free turnout gear: "Transitioning to PFAS-free equipment is a critical step in advancing our mission: safeguarding the public by ensuring our firefighters remain healthy and able to serve at their highest capacity. . . . By investing in the well-being of our firefighters, we strengthen the health, resilience, and safety of San Francisco as a whole."

136. IAFF affirmed the importance of laws such as those passed in Illinois, Connecticut, and Massachusetts, stating in part that: "Reducing carcinogenic exposure from protective gear is a key part of the IAFF's ongoing mission to combat the cancer epidemic in the fire service."

137. The National Fallen Firefighters Foundation, International Association of Fire Chiefs, Volunteer and Combination Officers Section, and National Volunteer Fire Council have affirmed that occupational cancer is a serious threat to firefighters.

138. NIST, IAFF, and U.S. Fire Administration warn that PFAS in Turnout Gear are "potentially cancer-causing chemicals" linked to cancer and other serious effects.

### *A. Defendants' Use of the NFPA Standard-Setting Process to Entrench PFAS*

139. For years, turnout gear was certified under NFPA 1971, Standard on Protective Ensembles for Structural Fire Fighting and Proximity Fire Fighting, promulgated by the National Fire Protection Association ("NFPA") through a technical committee that, by NFPA's own rules, reserves seats for "Manufacturer" interests. NFPA 1971 imposed a light-degradation-resistance (ultraviolet exposure) requirement on turnout-gear moisture barriers that, as a practical matter, only PFAS based materials such as expanded polytetrafluoroethylene ("ePTFE") could satisfy. Because NFPA certification is a de facto precondition to the sale and use of turnout gear by fire departments nationwide, this facially neutral testing requirement operated, in substance, as a mandate that manufacturers use PFAS-containing moisture-barrier materials to bring a sellable product to market.

140. On information and belief, one or more Defendants, through officers, employees, or committee representatives, held manufacturer-interest seats on the NFPA technical committee responsible for this requirement and used that position to advocate for, and to resist elimination of, the very testing protocol that necessitated PFAS-containing components in the products those Defendants manufactured, assembled, and sold.

141. Beginning in and around 2021, firefighters and their representative organizations pressed NFPA to remove or relax the light-degradation-resistance requirement so that PFAS-free

alternatives could be certified and brought to market. Representatives affiliated with PFAS material and PFAS gear manufacturers actively opposed that effort within the standard-setting process, notwithstanding mounting scientific evidence, including from federal researchers, that PFAS in turnout gear posed serious, unreasonable risks to firefighter health. NFPA did not remove the requirement until its substantially revised NFPA 1970 (2025 edition), years after those risks were known or should have been known to Defendants, and only after firefighter organizations, researchers, and litigation directed at NFPA itself had drawn public attention to the requirement's role in perpetuating PFAS use in Turnout Gear.

142. Defendants' participation in, and influence over, this standard-setting process was not incidental. Defendants had, and knew they had, a direct and substantial financial interest in the continued use of PFAS-containing components and in the maintenance of technical requirements that only such components could satisfy. Upon information and belief, Defendants acted in concert with one another, and with other PFAS-material and PFAS-gear manufacturers, to preserve and perpetuate requirements within NFPA's standard-setting process that served Defendants' shared commercial interest in continued PFAS use, at the expense of the health and safety of the firefighters required to wear the certified equipment those requirements produced.

143. Firefighters, advocacy groups, unions, government agencies, and scientific bodies are aligned in identifying PFAS Turnout Gear as a significant PFAS-exposure pathway and a catastrophic hazard to human health.

144. PFAS cannot be used safely as a component of Turnout Gear.

## III. Defendants' Knowledge of PFAS Toxicity

145. While the public is just beginning to discover the catastrophic effects of PFAS on the environment and human health, Defendants have known about their toxicity for decades.

Moreover, Defendants shared information amongst and between themselves while misleading the public and concealing data and information about the risks of PFAS exposure and its propensity to contaminate surrounding property.

146. Defendants knowingly and intentionally added high concentrations of PFAS to Turnout Gear, despite knowing that (1) PFAS exposure has catastrophic health effects; (2) the PFAS would migrate from the Turnout Gear and contaminate and harm surrounding property and persons; (3) PFAS concentrations and migration would increase with normal use and handling of the Turnout Gear and with exposure to the extreme stressors typically encountered as part of firefighting; and (4) PFAS was an unsafe component in Turnout Gear.

### *A. 3M Has Long Known of the Dangers PFAS Causes*

147. Defendant 3M was the largest manufacturer of PFAS in the United States from the 1940s through the early 2000s.

148. 3M has known for decades that PFAS exposure is associated with adverse, substantial, and potentially lethal effects on human health.

149. As early as the 1950s, 3M began a series of studies on the physiological and toxicological properties of PFAS, concluding that PFAS were harmful to animals, humans, and the environment. 3M discussed the findings of these studies internally and often shared them with DuPont, but it did not publicize or share the findings with any regulatory agencies. Notably:

a. In 1950, 3M documented that PFAS accumulate in the blood of mice following exposure.

b. In 1963, 3M documented PFAS as being “toxic,” stable in the environment, and “completely resistant to biological attack.”

c. By the 1970s, 3M had documented PFAS in fish and was aware that PFAS were hazardous to marine life.

d. In 1975, 3M learned there was "universal presence" of PFAS in human blood samples taken from across the United States.

e. In 1976, 3M began monitoring its employees' blood for PFAS because the company was concerned about potential health effects.

f. In 1978, 3M conducted multiple PFOA and PFOS studies on monkeys and rats. The studies showed that PFOA and PFOS affected the liver and gastrointestinal tract of the animals tested. 3M documented that PFAS "should be regarded as toxic."

g. In 1978, 3M had to abort a study when all the test monkeys died within the first few days or weeks after being given food contaminated with PFOS. The deaths were attributed to the "compound effect" of PFOS.

h. In 1979, an internal 3M report discussing the studies on PFOA and PFOS stated that PFAS were "more toxic than anticipated," recommending that "lifetime rodent studies . . . be undertaken as soon as possible."

i. In 1979, an internal 3M memo concluded that it was "paramount to begin now an assessment of the potential (if any) of long term (carcinogenic) effects for these compounds which are known to persist for a long time in the body and thereby give long term chronic exposure."

j. In 1981, 3M moved twenty-five female employees "of childbearing potential" off production lines at its Decatur, Alabama plant "[a]s a precautionary measure" based on internal research showing that PFAS were causing birth defects in rats.

k. In 1987, 3M shared with DuPont the results of a two-year study where rats were fed a diet with added PFAS, resulting in the growth of cancerous tumors.

l. In 1989, a review of mortality data among 3M's chemical division workers found, compared to Alabama death rates, a "statistically significant excess" of deaths by "cancer of the digestive organs and peritoneum."

150. Section 8(e) of the Toxic Substances Control Act ("TSCA") required chemical manufacturers and distributors to immediately notify the EPA if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or to the environment." This reporting requirement has been included in the TSCA since its enactment in 1976.

151. Despite decades of alarming data, 3M did not share any of its concerns about the risks of PFAS with regulatory agencies until 1998, when it submitted a TSCA § 8(e) letter to the EPA regarding PFOS.

152. In 1998, the EPA first learned that PFAS were in the blood of the general human population. Shortly thereafter, 3M produced over 1,000 studies it had previously withheld from the EPA.

153. In 2006, 3M agreed to pay the EPA a penalty of more than $1.5 million after being cited for violations of the TSCA, including violations for failing to disclose studies regarding PFOS, PFOA, and other PFAS.

154. In 2022 and following a multi-year probe into both companies, California announced it was suing 3M, along with DuPont, for manufacturing PFAS with knowledge of its carcinogenic properties. In response, 3M spokesperson Carolyn LaViolette released a statement that the

company "acted responsibly in connection with products containing PFAS and will defend its record of environmental stewardship."

155. The same year, 3M reported to Maine that it sold more than 20,000 products containing PFAS in the United States in 2021 and 2022. Those products included Scotchlite reflective tape, which can be found on Turnout Gear purchased by the City.

156. Also in 2022, 3M announced that it would work to discontinue the use of PFAS across its product portfolio by the end of 2025. In its announcement, Mike Roman, 3M's Chairman and Chief Executive Officer, asserted that "[w]hile PFAS can be safely made and used, we also see an opportunity to lead in a rapidly evolving external regulatory and business landscape for those we serve." In connection with the announcement, and prior to the alleged phase out of PFAS, 3M maintained that "3M's products are safe for their intended uses."

### *B. The DuPont Defendants Have Long Known of the Dangers of PFAS*

157. Prior to spinning off portions of the company, DuPont was the largest chemical company in the world in terms of sales.

158. DuPont has known for decades that PFAS exposure is associated with adverse, substantial, and potentially lethal effects on human health.

159. In 1935, DuPont established Haskell Laboratories, one of the first in-house toxicology facilities, at the urging of a staff doctor worried about the company's demonstrated "tendency to believe [chemicals] are harmless until proven otherwise."

160. In 1954, DuPont employee R.A. Dickinson noted that he had received an inquiry regarding PFOA's "possible toxicity."

161. As early as the 1960s, DuPont was repeatedly made aware, via both internal and external research and data, that PFAS were harmful to animals, humans, and the environment. Notably:

a. In 1961, a team of in-house researchers at DuPont concluded that PFOA was indeed toxic and should be "handled with extreme care." By 1962, a series of experiments by in-house researchers at DuPont had confirmed that PFOA was associated with the enlargement of various organs in rats.

b. In 1965, fourteen employees at DuPont, including the then-director of Haskell Laboratories, received a memo describing preliminary studies indicating that even low doses of a related surfactant could increase the size of rats' livers, a classic response to exposure to poison.

c. In 1978, DuPont alerted employees to the results of a study done by 3M, which showed that 3M's employees were accumulating PFOA in their blood. Later in the same year, DuPont began reviewing employee medical records and measuring the levels of PFOA in the blood of its own workers, noting adverse patterns including increased rates of endocrine disorders.

d. By 1979, DuPont was aware of studies showing that beagles exposed to PFOA had abnormal enzyme levels "indicative of cellular damage" as well as a recent 3M study showing that some rhesus monkeys died when exposed to PFOA.

e. In 1981, DuPont transferred women out of work assignments with potential for exposure to PFOA, alerting them to the results of a 3M study suggesting an association between PFAS exposure and birth defects.

f. By 1982, DuPont's corporate medical director had become worried about the possibility of "current or future exposure of members of the local community from emissions leaving the plant's perimeter," as he explained in a letter to a colleague.

g. By the 1990s, DuPont knew that PFOA caused cancerous testicular, pancreatic, and liver tumors in lab animals.

h. In the 1990s, DuPont began developing an alternative to PFOA. In 1993, an interoffice memo announced that "for the first time, we have a viable candidate" that appeared to be less toxic and stayed in the body for a much shorter duration of time. Discussions were held at DuPont's corporate headquarters to discuss switching to the new compound. DuPont decided against it because products manufactured with PFOA were an important part of DuPont's business, worth $1 billion in annual profit.

i. In 1994, a small committee drafted a top-secret document, which was distributed to high-level DuPont employees around the world, discussing the need to "evaluate replacement of [PFOA] with other more environmentally safe materials" and presenting evidence of toxicity, which included a study finding an association between prostate cancer and exposure to PFOA.

162. In 2000, DuPont and 3M met to "clear [the parties'] mutual understanding of the pertinent data on PFOA." Meeting notes documented that "DuPont was interested in any measurements of PFOA in general population samples." 3M informed DuPont that the half-life of PFOA was "much longer" than animal studies showed.

163. In 2001, a class-action lawsuit was filed against DuPont on behalf of people whose water had been contaminated by the nearby DuPont chemical plant where PFAS were manufactured.

164. In 2003, a consultant service with experience helping companies manage issues "allegedly related to environmental exposures," beginning with Agent Orange in 1983, wrote to DuPont in anticipation of a planned meeting, stating in part that "DuPont must shape the debate at all levels,"

and that, given the "threat of expanded litigation and additional regulation by the EPA," it was "necessary for DuPont to prepare an overall technical and scientific defense strategy."

165. In 2005, the EPA reached a settlement with DuPont related to violations of the TSCA for concealing the environmental and health effects of PFOA. The settlement included the largest civil administrative penalty the EPA had ever obtained under any environmental statute—$10.25 million—and further required DuPont to perform supplemental environmental projects worth $6.25 million.

166. In 2015, DuPont spun off its "performance chemicals" business, two-thirds of its environmental liabilities, and 90% of its active litigation to Chemours.

167. In 2019, Paul Kirsch, then-president of the fluoroproducts business at Chemours, testified before Congress that "DuPont designed the separation of Chemours to create a company where it could dump its liabilities and protect itself from environmental cleanup and related responsibilities."

168. In 2022 and following a multi-year probe into both companies, the state of California announced it was suing DuPont and 3M for manufacturing PFAS with knowledge of its carcinogenic properties. DuPont's response was to deny its role—claiming it had never manufactured PFOA, PFOS, or firefighting foam—and maintain that California's claims were without merit: "We believe this complaint is without merit, and we look forward to vigorously defending our record of safety, health and environmental stewardship."

169. Despite decades of covering up the dangers caused by PFAS, DuPont still asserts to the public that "safety" is at its "core."

### ***C. The Remaining Defendants Have Long Known of the Dangers of PFAS***

170. The remaining Defendants and other participants in the supply chain for PFAS Turnout Gear also knew or should have known of the dangers of PFAS.

171. Defendants have publicly acknowledged—whether in consumer advertising and/or product promotion, lobbying efforts, litigation, or otherwise—their awareness of increasing medical, environmental, governmental, and public concern regarding PFAS use and exposure.

172. Despite decades of scientific research warning of major risks caused by PFAS, Defendants have misrepresented the safety of PFAS and engaged in campaigns aimed to direct the public's attention away from the issue of PFAS in their products.

173. In 2023, Defendant Globe's Chief Operating Officer applauded a New Hampshire bill titled the "PFAS Alternatives Act," recognized "the demand for PFAS-free materials," and stated that "Globe looks forward to continuing its long-term advocacy efforts . . . to promote this investment in innovation and pass the PFAS Alternatives Act."

174. Moreover, in the early 2020s, as the toxic-exposure risk to products containing PFAS became more generally known, all Defendants became aware of an ongoing world-wide movement toward eliminating PFAS from myriad consumer products, including textiles.

175. During this period, many private companies, including Home Depot, Lowes, and Staples, began efforts to discontinue selling products containing PFAS, as did several outdoor, durable-clothing companies (e.g., Columbia and Marmot), clothing retailers (e.g., H&M, Levi Strauss & Co.), shoe companies (e.g., Adidas and New Balance), car-seat manufacturers (e.g., Britax and Graco), furniture companies (e.g., IKEA), personal-care companies (e.g., Johnson & Johnson and Oral-B), and textile-manufacturing companies.

176. In June 2020, Paul Chrostowski, Ph.D., a consultant hired by Lion, took out a page in the publication Firefighter Nation, arguing that PFAS Turnout Gear is completely safe and that

evidence to the contrary, such as the Peaslee study, "create[s] unnecessary fear and misunderstanding." Chrostowski argued that "it would be irresponsible to dissuade firefighters from using their protective gear out of fear of cancer," asserting that "[t]he materials used in Turnout Gear are the safest materials available."

177. In about 2020, the City of Burlington, North Carolina enlisted Duke University scientists to investigate potential sources of PFAS that were discharging into the City's wastewater treatment plants. The City of Burlington pinpointed Elevate Textiles as "its largest source of PFAS." Thereafter, a settlement agreement required Elevate Textiles to install a closed-loop system to capture contaminated wastewater from its production lines, and it was announced that Elevate Textiles would phase out its use of PFAS in some of its products by June 15, 2025.

178. Fire-Dex recently defended an action brought by its insurer seeking to effectively avoid its defense obligation for PFAS-related claims against the company. In its Complaint, the insurer alleged that Fire-Dex had been repeatedly named in lawsuits brought by firefighters and/or their spouses alleging bodily injuries due to PFAS exposure.

179. Gore advertises its "Materials Stewardship," asserting that its in-house scientists "are active participants in the scientific community, lending their expertise, research and time to broaden the understanding of [PFAS]." Despite these assertions, the State of Maryland filed suit against Gore arising from decades of PFAS environmental contamination.

180. Honeywell has lobbied state officials, submitted comments, and indicated its intent to seek exemptions regarding a recently passed Alabama law, which will take full effect in 2032, banning all non-essential uses of PFAS in eleven product categories.

181. In 2023, Honeywell (along with manufacturing company Saint Gobain) reached a $45 million agreement with New York's Department of Environmental Conservation to implement a

new water supply for the Hoosick Falls Village Water System and reimburse state taxpayers for the cost of the state's response to PFOA contamination in Hoosick Falls, New York.

182. Facing increasing medical, environmental, governmental, and public concern regarding the dangers caused by PFAS exposure, Defendants have publicly acknowledged—whether in consumer advertising and/or product promotion, lobbying efforts, litigation, or their denials—their awareness of the substantial injuries caused by PFAS.

183. All Defendants knew or should have known that Turnout Gear containing PFAS posed a substantial risk of injury to the health and safety of the City and its firefighters, in that it placed them at increased risk of adverse, substantial, and potentially lethal health effects, including but not limited to various cancers.

184. All Defendants knew or should have known that exposure to PFAS-contaminated materials and PFAS places humans at increased risk of adverse, substantial, and potentially lethal health effects, including but not limited to various cancers.

185. All Defendants knew or should have known that the Turnout Gear either treated with and containing PFAS Chemicals or contained in the component parts of Turnout Gear that they manufactured, distributed, marketed, offered for sale, or sold would be used in ways in which the City's firefighters would be exposed to the toxic properties of PFAS through dermal absorption, inhalation, and ingestion.

## IV. Defendants Conspired to Conceal the Risks of PFAS

186. Defendants knew that Turnout Gear containing PFAS was dangerous to the City's firefighters, in that it placed them at an increased risk of adverse, substantial, and potentially lethal health effects, including but not limited to various cancers. However, Defendants failed to disclose to the City or its firefighters the full extent of the health risks, and they failed to provide adequate

warnings to the City and its firefighters regarding the substantial risk of injury to firefighters posed by PFAS contaminated Turnout Gear.

187. Quite the opposite—Defendants continued to misrepresent the safety of Turnout Gear containing PFAS and engaged in campaigns, such as greenwashing, that were aimed to misinform and lessen public and regulatory concern regarding PFAS.

188. For instance, the common purpose and conduct of 3M and DuPont to cover up the truth about PFAS and PFAS-laden products is shown by a 3M Material Safety Data Sheet ("MSDS") that 3M had sent to DuPont in 1997.

189. The United States has long sought to protect workers who have been exposed to hazardous chemicals in the work environment. In November 1983, OSHA adopted the Hazard Communication Standard, which requires chemical manufacturers and importers to evaluate the hazards of chemicals that they produce and distribute, and to disseminate information about hazards and protective measures on container labels and MSDSs. The Hazard Communication Standard covers all chemicals in American workplaces.

190. In February 1997, 3M sent to DuPont an MSDS that stated: "CANCER WARNING: Contains a chemical which can cause cancer. (3825-24-1) (1983 and 1993 studies conducted jointly by 3M and DuPont)."

191. Instead of informing the public of the dangers caused by PFAS, 3M and DuPont suppressed the February 1997 MSDS as part of the wrongful conduct of the PFAS Cover-Up Enterprise. A former Minnesota Attorney General testified before a United States House Committee about a lawsuit by Minnesota against 3M for PFAS pollution, and testified that "3M removed the label that same year and for decades sold PFAS products without warning the public of its dangers." While the former Attorney General's testimony concerned 3M, the same is true of DuPont, which

associated with 3M to suppress the truth and to sell PFAS products for decades without warning the public of the dangers of those products.

192. Chemours has maintained and publicly advertised that "[w]e take very seriously our obligation to manage the PFAS compounds in our manufacturing processes in a responsible manner and our commitment to eliminate at least 99% of our PFAS air and water emissions from our manufacturing processes by 2030."

193. In 2017, Lion's President wrote a letter to the Editor of The Columbus Dispatch, demanding the newspaper's retraction of a PFAS news story and denying that its Turnout Gear "posed any health risks to firefighters." Even so, Lion admitted that its manufacturing partners "used PFOA in their manufacturing process as a processing aid," so "it is possible that trace amounts may have been present in Lion's turn-out gear."

194. In approximately 2019, Lion issued a "Customer Safety Alert" for "PFOA and Turnout Gear," asserting that "[y]our Lion Turnout Gear continues to be safe and ready for action especially when properly maintained."

195. In about 2021, Paul Chrostowski, Ph.D., the Lion consultant, created a presentation, "PFAS and LION Turnout Safety Gear," in which he asserted that PFAS "[l]evels in firefighters [are] similar to general population and not linked to turnout gear," even while acknowledging that older Lion Turnout Gear samples had "detected PFOA (up to 23.5 ppb)."

196. In 2019, Gore issued a public statement, asserting that "the potential exposures and associated risks of cancer effects from PFOA alternatives and non-polymeric perfluoroalkyl substances in Gore components [Turnout Gear] are insignificant."

197. Fire-Dex maintains and publicly advertises that its Turnout Gear is made with "the best materials the industry has to offer" and provides the specific benefit of "reduc[ing] [] carcinogen exposure."

198. Globe maintains and publicly advertises that the company is "committed to firefighter health & safety," and that "[Globe's] health, safety and well-being are what drive us . . . to advocate for your well-being."

199. In a New York Times article published in 2021, Gore maintained that its Turnout Gear products were safe.

200. In 2022, 3M publicly stated that it was not necessary or appropriate to declare any PFAS hazardous.

201. Defendants have repeatedly represented to the City, its firefighters, and the public that their products were safe for their intended uses, including the ways in which the City and its firefighters were expected to use, clean, and store the Turnout Gear. Meanwhile, Defendants' warning labels have not adequately disclosed the products' risks.

202. For example, DuPont maintained and publicly advertised that Turnout Gear manufactured with DuPont's materials "work hard to help keep your professionals safe, inside and out," and "are helping keep first responders safe."

203. MSA, which is Globe's parent company, maintains and publicly advertises that the company is "committed to firefighter health & safety."

204. Lion maintains and publicly advertises that the company "makes the gear emergency service providers, civilian responders and militaries need to stay safe in the line of duty."

205. Honeywell maintains and publicly advertises that the company's "safety solutions protect the future of 500 million workers" and refers to its turnout gear products as "the pioneer of safety by design."

206. Defendants have made broad statements promoting the safety of their products, while they have worked together for decades on firefighter PPE that contains dangerous levels of toxic PFAS chemicals.

## V. Defendants Failed to Provide Adequate Warnings of PFAS Risks

207. As alleged above, the PFAS Turnout Gear purchased and/or paid for by the City did not contain appropriate labeling information or warnings:

a. Indicating that the gear contained or may contain PFAS;

b. Indicating that the gear specifically contained or may specifically contain PFOA or PFOS;

c. That heat exposure to PFAS significantly increases the risk of toxic compounds being released into the air;

d. That newer PFAS can degrade into persistent, hazardous PFAS compounds;

e. Regarding the health risks associated with exposure to PFAS;

f. Regarding the health risks associated with exposure to PFOA or PFOS; or

g. That the Turnout Gear contained PFAS or PFAS-containing materials, and that handling, wearing, or using the Turnout Gear as it was intended to be handled, worn, cleaned, used, or stored can result in exposure to PFAS and adverse effects to human health.

## VI. Defendants Had the Ability to Design Safer Turnout Gear

208. Despite Defendants' expressed position that PFAS were "essential" in Turnout Gear, at all relevant times, it was technologically and economically feasible to design and manufacture Turnout Gear that did not contain PFAS chemicals.

209. In fact, Defendants had the knowledge and technical ability to design and manufacture PFAS-free chemicals and materials that could be incorporated into Turnout Gear to ensure that the Turnout Gear had appropriate durable water-repellent and heat-resistant characteristics.

210. In or around 2021, Gore announced its upcoming launch of a PFAS-free fabric-waterproofing technology, which was praised for its apparent potential to "greatly increase the availability of PFAS-free water-repellant garments."

211. In or around 2021, PPE fabric manufacturer Fire-Dex, in conjunction with Milliken, as well as Honeywell, announced the introduction of PFAS-free material options for Turnout Gear.

212. In fall 2022, a group of students at UC Berkeley's Center for Green Chemistry, in partnership with the IAFF, conducted their own semester-long study into safer alternatives to PFAS in Turnout Gear and were able to offer multiple, alternative recommendations for manufacturers. For example, the students concluded that polyethylene laminate could be used as a potential alternative to PTFE in the middle moisture barrier of firefighter Turnout Gear.

213. At least as of 2025, PFAS-free Turnout Gear was available in the marketplace that complied with the water-repellent and heat-resistant characteristics for firefighter PPE illustrated in applicable NFPA standards.

214. A practical, technologically feasible, and economically reasonable alternative design for Turnout Gear existed at all relevant times, and exists today: Turnout Gear constructed with non-fluorinated outer-shell treatments and non-fluorinated moisture-barrier membranes. Such gear satisfies the thermal-protective performance, total heat loss, water-penetration resistance, and

viral-penetration resistance requirements applicable to structural firefighting ensembles, and does not contain or release PFAS.

215. Non-fluorinated durable water repellent treatments suitable for protective outer-shell fabrics, including silicone-based, hydrocarbon-wax-based, and dendrimer-based repellent chemistries, have been commercially available for decades and have long been used in other demanding technical-textile applications.

216. Non-fluorinated moisture-barrier membranes and laminates, including polyurethane and polyethylene-based membranes, were technologically available and, upon information and belief, were known to the Component Manufacturer Defendants and the Assembler Defendants as feasible substitutes for ePTFE well before Defendants brought PFAS-free Turnout Gear to market.

217. Upon information and belief, the incremental cost of manufacturing Turnout Gear with non-fluorinated shell treatments and non-fluorinated moisture barriers was, and is, modest in relation to the price of the finished Turnout Gear, and was substantially less than the costs of remediation, retrieval, destruction, disposal, and replacement that PFAS Turnout Gear has imposed on the City.

218. The safer alternative design was not adopted because Defendants elected to preserve the commercial advantages of PFAS-containing materials and the technical requirements that only such materials could satisfy, and because Defendants concealed the hazards that would have caused purchasers such as the City to demand PFAS-free gear.

## VII. Defendants Failed to Disclose the Unfit and Dangerous Nature of the Turnout Gear

219. During the relevant time period, the City, in the ordinary course, purchased, paid for, or otherwise provided Turnout Gear that contained PFAS chemicals and/or included textiles or

component parts treated or contaminated with PFAS chemicals that Defendants manufactured, distributed, marketed, offered for sale, sold, or otherwise provided to the City.

220. At the time of purchase of such PFAS treated or contaminated Turnout Gear, Defendants did not adequately disclose or warn the City regarding the full extent of the PFAS treatment and contamination of the PPE; the full nature and extent of the substantial threat and risk of harm to the health and safety of firefighters and others posed by the use, cleaning, and storing of the PFAS treated and contaminated Turnout Gear; and did not adequately disclose to the City that the Turnout Gear was not merchantable; was not fit for its intended use; was unreasonably dangerous to firefighters and others from its expected use, cleaning, and storage; and that the Turnout Gear should not be purchased or otherwise acquired by the City.

221. Defendants misrepresented through public statements and concealment of information known to them that PFAS treatment or contamination of PPE did not render firefighter PPE unmerchantable, unfit, unsafe, and unreasonably dangerous for its intended use, expected cleaning, and storage.

222. Defendants failed to inform the City of the inherent danger and substantial risk to health and safety posed by the PFAS treated and/or contaminated Turnout Gear, and of the risk of injury or harm to human health posed by the expected use, cleaning, and storage of the Turnout Gear.

223. In acting as alleged in this Complaint, Defendants deprived the City of the information necessary for it to make informed business decisions regarding purchasing the Turnout Gear acquired during the relevant time period and to take the reasonable and necessary steps to protect the City, its firefighters, and others exposed to the danger posed by the Turnout Gear resulting from expected use, cleaning, and storage.

## VIII. Representative Misrepresentations and Omissions Made to the City

224. Defendants communicated with the City, and caused communications to be delivered to the City, through the United States mails and by interstate wire, in connection with each stage of the City's acquisition of Turnout Gear. Those communications included product catalogs and product literature; written technical specifications and data sheets describing the outer shell, moisture barrier, and thermal liner of the offered gear; invitations to bid, bid packages, and bid responses; quotations, purchase-order confirmations, and invoices; NFPA certification labels, product identification labels, and user information guides affixed to or shipped with the gear; care, cleaning, laundering, and storage instructions; and marketing and safety communications directed to fire departments and to the fire service generally.

225. In each such communication concerning the composition, safety, care, and suitability of the Turnout Gear, Defendants represented, expressly or by necessary implication, that the Turnout Gear was safe and suitable for its intended use by a municipal fire department, including for wear, handling, laundering, and storage in fire stations and on apparatus, and Defendants omitted any disclosure that the gear contained PFAS, that the PFAS in the gear would migrate out of the gear during ordinary use and handling, that such migration would contaminate the purchasing department's stations, apparatus, equipment, and other property, or that remediation and replacement would become necessary as a result.

226. Defendants' care, cleaning, laundering, and storage instructions affirmatively directed the City to handle, launder, and store the Turnout Gear in ways that Defendants knew would release PFAS into the City's stations, laundering facilities, wash water, and apparatus, and those instructions contained no warning that such handling would cause PFAS contamination of the City's property or any instruction as to the specialized handling, laundering, containment, or disposal protocols that PFAS-laden gear in fact requires.

227. The NFPA certification labels affixed to the Turnout Gear, and Defendants' representations that the gear was certified as compliant with applicable NFPA standards, conveyed to the City that the gear had been evaluated and found suitable and safe for structural firefighting use. Defendants knew that the City and other municipal purchasers relied on NFPA certification as an assurance of safety, and Defendants knew, and did not disclose, that the certification requirements had been shaped by Defendants and their industry representatives in a manner that required the use of PFAS-containing materials.

228. In connection with the City's specification, bidding, purchase, and use of the Turnout Gear, Defendants and the Distributor Defendant failed to disclose to the City the presence of PFAS in the Turnout Gear, the propensity of that PFAS to migrate out of the gear during ordinary use, handling, laundering, and storage, and the resulting contamination of the City's property—facts within Defendants' knowledge and neither known to nor reasonably discoverable by the City—while representing, expressly and by implication, that the Turnout Gear was safe and suitable for its intended use. Representative of Defendants' affirmative misrepresentations concerning the safety of PFAS and PFAS Turnout Gear, each directed to the fire service and to purchasers of Turnout Gear including the City, are the statements alleged above at paragraphs 176, 194, 195, 196, and 202. In addition, the Turnout Gear the City purchased bore affixed to it, and was accompanied by, NFPA certification labels, product-identification labels, and user information guides, together with the care, cleaning, laundering, and storage instructions supplied with the gear—communications the City necessarily received and relied upon. Each represented, expressly or by necessary implication, that the Turnout Gear was safe and suitable for its intended use, and none disclosed that the gear contained PFAS, that the PFAS would migrate out of the gear during ordinary use, handling, laundering, and storage, or that such migration would contaminate the

City's property. Upon information and belief, Defendants and the Distributor Defendant also transmitted to the City, in connection with its acquisition of the Turnout Gear, bid packages and responses, catalogs, specification and technical data sheets, quotations, purchase orders, and invoices to the same effect, the particulars of which are reflected in the City's and BFRS's procurement, bid, and invoice records and in Defendants' sales and shipping records and which the City will identify with further particularity following discovery.

229. Had Defendants disclosed that the Turnout Gear contained PFAS, that the PFAS would migrate out of the gear during ordinary use, handling, laundering, and storage, and that such migration would contaminate the City's property and require remediation, the City would not have purchased the PFAS Turnout Gear, would not have paid the prices it paid, would have purchased PFAS-free Turnout Gear or demanded that Defendants supply it, and would have implemented handling, laundering, containment, and disposal protocols that would have prevented or substantially limited the contamination of its property.

230. Many of the precise dates and contents of Defendants' internal communications concerning PFAS toxicity, the migration of PFAS from Turnout Gear, and the decision not to disclose those facts are within Defendants' exclusive possession, custody, or control, and have been concealed by Defendants. The City will identify those communications with further particularity upon obtaining discovery.

## IX. The City's Injuries and Damages

231. The PFAS that migrated out of the PFAS Turnout Gear contaminated property of the City other than the Turnout Gear itself. That other property includes, without limitation: the City's fire station buildings, including floors, walls, ceilings, carpeting, porous building materials, plumbing, and drains; the City's heating, ventilation, and air conditioning systems; the City's apparatus bays;

the City's fire apparatus and vehicles, including cabs, seating, and interior surfaces; the City's gear lockers, storage rooms, and shelving; the City's laundering equipment, extractors, and dryers, and the wash water and wastewater generated by them; the City's bunk rooms, furnishings, mattresses, and linens; the City's other occupational equipment stored or used in proximity to the Turnout Gear; and the soil and grounds surrounding the City's fire stations.

232. The contamination of that other property was a direct, foreseeable, and intended consequence of the ordinary use, handling, laundering, and storage of the PFAS Turnout Gear in the manner Defendants instructed and expected. The contamination did not result from any misuse, alteration, or abnormal handling of the gear by the City.

233. As a direct and proximate result of Defendants' conduct, the City has incurred and will incur damages including, without limitation:

a. The costs of investigating, sampling, and testing the City's fire stations, apparatus, equipment, laundering facilities, and other property for PFAS contamination;

b. The costs of remediating, decontaminating, repairing, and where necessary replacing the contaminated other property described above, including specialized remediation protocols required for PFAS;

c. The costs of treating and disposing of PFAS-contaminated wash water and wastewater generated by the laundering of the PFAS Turnout Gear;

d. The costs of retrieving, containing, transporting, destroying, and lawfully disposing of the PFAS Turnout Gear, which cannot be resold, donated, or placed in ordinary solid waste;

e. The costs of procuring replacement Turnout Gear that is free of PFAS and fit for the purpose for which the City purchased Turnout Gear in the first instance;

f. The amounts the City paid to Defendants and to Defendants' distributors for PFAS Turnout Gear that was unfit, unreasonably dangerous, and worth substantially less than the City paid, and that the City would not have purchased had Defendants disclosed the truth;

g. The costs of developing and implementing specialized handling, laundering, containment, segregation, and storage protocols for PFAS Turnout Gear remaining in service pending replacement; and

h. The City's own expenditures as an employer and as a governmental entity attributable to occupational disease caused by the PFAS in the PFAS Turnout Gear, as described below; and

i. Such other and further consequential and incidental damages as the evidence will show.

234. The City's damages are ongoing. Until the PFAS Turnout Gear is retrieved, destroyed, and disposed of, and the contaminated property is remediated, PFAS will continue to migrate out of the gear and continue to contaminate the City's property.

235. The City does not seek in this action, and expressly disclaims, any recovery on behalf of any individual firefighter, employee, or other person for personal injury, bodily harm, disease, wrongful death, medical monitoring, or emotional distress. No such individual is a plaintiff in this action and no such claim is asserted here. The City does, however, seek recovery of its own expenditures made as an employer and as a self-insured or insured governmental entity, including amounts it has paid and will pay for workers' compensation benefits, medical and health insurance costs, disability and line-of-duty disability payments, death benefits, presumptive occupational-disease benefits, and the costs of replacing and retraining personnel, to the extent those

expenditures are attributable to occupational disease caused by the PFAS in the PFAS Turnout Gear that Defendants sold to the City. Those expenditures are the City's own economic losses, incurred by the City in its own right and paid from its own funds, and are not sought as derivative of, or as an assignment or subrogation of, any individual's personal injury claim.

## X. Tolling and Estoppel of Applicable Limitations Periods

236. For decades, Defendants had knowledge of the hazards to the health and safety of the City and its firefighters, and to its property, caused by exposure to PFAS.

237. By the 1960s and continuing for decades, Defendants conducted internal studies that demonstrated the toxicity of PFAS chemicals. In addition, newer PFAS can degrade into persistent, hazardous PFAS compounds.

238. Defendants knew or should have known that they were creating an unacceptable health risk to the City and its firefighters by designing, manufacturing, and selling Turnout Gear that was treated with PFAS.

239. Defendants intentionally concealed this information from the City, its firefighters, and the public.

240. Defendants intentionally and continuously misrepresented the safety of the Turnout Gear treated with PFAS, PFAS-laden materials, and PFAS, assuring the City, its firefighters, as well as the public and governmental authorities, that the Turnout Gear treated with PFAS, PFAS-laden materials, and PFAS were safe.

241. At all relevant times, Defendants did not adequately disclose or warn the City of the true nature of the dangers posed by PFAS-laden firefighter Turnout Gear.

242. Neither the City nor its firefighters, through the exercise of reasonable care or due diligence, could have discovered the true nature of Defendants' products as alleged herein. Further,

the City did not discover and did not know of facts that would have caused a reasonable person to suspect that Defendants were engaged in the conduct alleged herein.

243. For these reasons, all applicable statutes of limitations have been tolled by the discovery rule with respect to claims asserted by the City.

**XI. Fraudulent Concealment**

244. For decades, Defendants concealed their conduct and the existence of the claims asserted herein from the City.

245. Because of Defendants' active and ongoing concealment of the hazards of PFAS—as well as the unique dangers posed to firefighters through dermal absorption, ingestion, and inhalation of PFAS through off-gassing and migration—the City could not have reasonably discovered the causes of action alleged herein.

246. For this reason, applicable limitations on actions and claims, at law or in equity, asserted herein or any statute of limitations that otherwise may apply to the claims of the City should be tolled.

## CAUSES OF ACTION

### COUNT I
### Violation of the Racketeer Influenced and Corrupt Organizations Act
### 18 U.S.C. §§ 1962(c), 1964(c)
### (Against All Defendants)

247. The City incorporates by reference and realleges each of the preceding paragraphs as if fully set forth herein.

248. All Defendants are "persons" under 18 U.S.C. § 1961(3) because they can hold, and do hold, "a legal or beneficial interest in property."

249. Under 18 U.S.C. § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Section 1962(d), in turn, makes it unlawful for "any person to conspire to violate any of the provisions of subsection . . . (c)."

250. For years, each of the Defendants created and participated in the affairs of an illegal enterprise. The PFAS Cover-Up Enterprise's purpose was to conceal the dangers of the Defendants' PFAS products, including PFAS-laden products sold to Turnout Gear manufacturers. As set forth below, the acts of Defendants in furtherance of the PFAS Cover-Up Enterprise violate Section 1962(c) and (d).

### *A. The Members of the PFAS Cover-Up Enterprise*

251. The Defendants are all members of the PFAS Cover-Up Enterprise. Concealment of the dangers of PFAS benefitted the enterprise in several ways. First, many of the Defendants, including 3M and DuPont, make other PFAS-laden products, and disclosing the dangers of PFAS in Turnout Gear would have called into question the safety of those other products. Second, DuPont was facing increasing and substantial potential liability for environmental damage its manufacturing of PFAS caused in the United States and other countries, and Defendants were thus unwilling to state the truth about the dangers of PFAS in Turnout Gear so as to avoid fueling further litigation about their products. Third, had Defendants disclosed the dangers caused by PFAS in Turnout Gear, other firms would have developed PFAS-free Turnout Gear earlier.

252. 3M had substantial control over, and participated in, the affairs of the PFAS Cover-Up Enterprise by misrepresenting and omitting (or causing such misrepresentations and omissions to be made) the truth about PFAS and PFAS Turnout Gear to the City, its firefighters, and the public, including by:

a. Concealing from government regulators the truth about the dangers of PFAS Turnout Gear;

b. Persisting in the manufacturing and distribution of PFAS products despite knowing about their dangers; and

c. Designing and distributing marketing materials that misrepresented and concealed the truth about the dangers of PFAS in PFAS Turnout Gear.

253. DuPont and Chemours had substantial control over (and controlled) the affairs of the PFAS Cover-Up Enterprise by:

a. Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) the truth about Turnout Gear to fire departments, the City, its firefighters, and the public;

b. Concealing from government regulators the truth about the dangers of PFAS Turnout Gear;

c. Persisting in the manufacturing and distribution of PFAS products despite knowing about their dangers; and

d. Designing and distributing marketing materials that misrepresented and concealed the truth about the dangers of PFAS in Turnout Gear.

254. The Component Manufacturer Defendants had substantial control over (and participated in) the affairs of the PFAS Cover-Up Enterprise by:

a. Manufacturing, distributing, and selling PFAS Turnout Gear;

b. Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) the truth about Turnout Gear to the City, its firefighters, and the public;

c. Introducing PFAS Turnout Gear into the stream of U.S. commerce;

d. Concealing from government regulators the truth about the dangers of PFAS Turnout Gear;

e. Persisting in the manufacturing and distribution of PFAS products despite knowing about their dangers; and

f. Designing and distributing marketing materials that misrepresented and concealed the truth about the dangers of PFAS in PFAS Turnout Gear.

255. The Assembler Defendants had substantial control over (and participated in) the affairs of the PFAS Cover-Up Enterprise by:

a. Manufacturing, distributing, and selling Turnout Gear to fire departments and others;

b. Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) the truth about Turnout Gear to the City, its firefighters, and the public;

c. Introducing PFAS Turnout Gear into the stream of U.S. commerce;

d. Concealing from government regulators the truth about the dangers of PFAS Turnout Gear;

e. Persisting in the manufacturing and distribution of PFAS products despite knowing about their dangers; and

f. Designing and distributing marketing materials that misrepresented and concealed the truth about the dangers of PFAS Turnout Gear.

256. The Distributor Defendant had substantial control over, and participated in, the affairs of the PFAS Cover-Up Enterprise by:

a. Soliciting, marketing, selling, and distributing PFAS Turnout Gear to the City and to other Alabama fire departments;

b. Preparing and transmitting to the City bid packages, catalogs, specifications, technical data sheets, quotations, and product literature that represented the Turnout Gear as safe and suitable and omitted the presence and hazards of PFAS;

c. Serving as a principal source of product information for the City, and transmitting to the City the misrepresentations and omissions originated by the other members of the Enterprise;

d. Persisting in the sale and distribution of PFAS Turnout Gear despite knowing of its dangers; and

e. Concealing from the City the truth about the dangers of PFAS Turnout Gear.

257. All members of the PFAS Cover-Up Enterprise directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which the City cannot fully know at present because such information lies in Defendants' and others' hands.

258. All members of the PFAS Cover-Up Enterprise served the common purpose of concealing the dangers of PFAS-laden products from the City, its firefighters, and the public. Each member of the PFAS Cover-Up Enterprise shared in its bounty (i.e., by continuing to sell PFAS-laden products for decades even though they knew that PFAS in those products posed grave dangers).

259. 3M makes dozens of products that contain PFAS, and 3M faces billions of dollars in potential liabilities. As noted in its Fiscal Year 2024 SEC Form 10-K, 3M has been voluntarily cooperating with various local, state, federal, and international agencies in their reviews of the environmental and health effects of PFAS, and is defending lawsuits and unasserted and asserted claims concerning various PFAS-related products and chemistries. 3M recorded a pre-tax charge of $897 million in the first quarter of 2018 with respect to a settlement with the State of Minnesota

involving PFAS in the groundwater, surface water, fish, and sediments in the state, and in June 2023 entered into a class-action settlement to resolve a wide range of PFAS-related drinking water claims by public water suppliers, agreeing to pay $10.5 billion to $12.5 billion from 2024 through 2036.

260. Likewise, Globe, according to its parent company MSA's Fiscal Year 2024 Form 10-K, is defending claims in which plaintiffs assert that certain products allegedly containing PFAS have caused harm, including injury or health issues. Globe builds firefighter Turnout Gear from technical fabrics sourced from a small pool of specialty textile manufacturers, some of which, as supplied to Globe, contain or historically have contained PFAS to achieve performance characteristics such as water, oil, or chemical resistance. As of February 4, 2025, Globe was named as a defendant in approximately 663 lawsuits comprised of about 8,801 claims, predominantly styled as individual personal injury claims and including two putative class actions, certain of which also name MSA or other Globe affiliates as defendants.

### *B. The Structure, Distinctness, and Continuity of the Enterprise*

261. The PFAS Cover-Up Enterprise is an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4). It consists of Defendants and of other PFAS material suppliers, industry associations, trade groups, consultants, and standard-setting participants whose identities are known to Defendants and will be established through discovery. The Enterprise is engaged in, and its activities affect, interstate and foreign commerce.

262. The Enterprise has a purpose: to sell and to continue selling PFAS-containing materials and PFAS Turnout Gear at prices and volumes that would not have been achievable had the hazards of PFAS in Turnout Gear been disclosed, and to conceal those hazards from fire departments, municipal purchasers, standard-setting bodies, regulators, and the public.

263. The Enterprise has relationships among those associated with it: contractual supply relationships along the Turnout Gear supply chain; joint research, testing, and data-sharing arrangements, including the decades-long exchange of toxicological data between 3M and DuPont; joint participation in industry associations and trade groups; joint participation in the NFPA technical committee process described above; and shared consultants and public-relations resources, including consultants retained to publish and disseminate statements minimizing the hazards of PFAS in Turnout Gear.

264. The Enterprise has longevity sufficient to permit its associates to pursue its purpose: it has operated continuously for decades, from at least the 1960s through the present, and its conduct is ongoing.

265. The Enterprise functions as a continuing unit with an ascertainable structure separate and apart from the pattern of racketeering activity in which it engages. Its structure is supplied by the vertically integrated Turnout Gear supply chain, by the industry associations and trade groups through which its members coordinate, and by the NFPA standard-setting process through which its members shaped the technical requirements governing their own products.

266. Each Defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c) that is distinct from the PFAS Cover-Up Enterprise. The Enterprise comprises multiple legally distinct entities together with other participants, and no Defendant is coextensive with the Enterprise. Each Defendant conducted and participated in the conduct of the affairs of the Enterprise, as distinguished from conducting only its own affairs, by taking the actions described above in coordination with, in reliance upon, and for the benefit of the other members of the Enterprise.

### *C. RICO Predicate Acts*

267. To carry out or attempt to carry out the scheme to defraud, the members of the PFAS Cover-Up Enterprise conducted or participated in the conduct of the affairs of that enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud).

268. Specifically, the members of the PFAS Cover-Up Enterprise participated in the scheme to defraud by using mail, telephone, and the Internet to transmit writings traveling in interstate or foreign commerce.

269. The PFAS Cover-Up Enterprise members' use of the mails and wires include the transmission, delivery, or shipment of PFAS products to fire departments and others; documents and communications accompanying those shipments; false or misleading MSDSs, Safety Data Sheets, Technical Data Sheets, and product labels; sales and marketing materials that misrepresented and concealed the true nature of Turnout Gear; documents intended to facilitate the manufacture and sale of PFAS-laden products, including invoices, shipping records, reports, and correspondence; documents to process and receive payment for PFAS Turnout Gear; payments to the PFAS Cover-Up Enterprise members for PFAS Turnout Gear; deposits of proceeds from sales of PFAS Turnout Gear; and other documents and things, including electronic communications.

270. The PFAS Cover-Up Enterprise members used the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described herein.

271. The PFAS Cover-Up Enterprise members also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships, and other third-party entities in furtherance of the scheme.

272. The mail and wire transmissions described herein were made in furtherance of the PFAS Cover-Up Enterprise members' scheme and common course of conduct to deceive regulators and consumers and lure Turnout Gear manufacturers into purchasing products that the PFAS Cover-Up Enterprise members knew emit PFAS.

273. The predicate acts of mail and wire fraud committed in furtherance of the scheme include the following, each transmitted through the United States mails and/or by interstate wire:

(a) in or about June 2020, Lion, through its retained consultant Paul Chrostowski, Ph.D., caused to be published and distributed in interstate commerce a full-page advertisement in the trade publication Firefighter Nation representing that PFAS Turnout Gear is "completely safe," that contrary scientific evidence "create[s] unnecessary fear and misunderstanding," and that "[t]he materials used in Turnout Gear are the safest materials available";

(b) in or about 2019, Lion transmitted to its customers, by mail and interstate wire, a "Customer Safety Alert" concerning "PFOA and Turnout Gear" representing that "[y]our Lion Turnout Gear continues to be safe and ready for action"; and

(c) in 2019, Gore issued and disseminated by interstate wire a public statement representing that the cancer risks from PFOA alternatives and non-polymeric perfluoroalkyl substances "in Gore components [Turnout Gear] are insignificant." Each of the foregoing communications was false or materially misleading when made, was directed to the fire service and to purchasers of Turnout Gear including the City, and was made to induce fire departments and municipal purchasers, including the City, to purchase PFAS Turnout Gear without knowledge of the PFAS it contained. In addition, the PFAS Cover-Up Enterprise members committed and caused to be committed numerous further acts of mail and wire fraud in furtherance of the scheme, including the transmission by mail and interstate wire of product literature, specifications, technical data

sheets, NFPA certification and product-identification labels, care and laundering instructions, bids, quotations, invoices, and payment records in connection with the sale of PFAS Turnout Gear to the City and other fire departments. The precise dates and contents of many of those further communications are within Defendants' exclusive possession, custody, or control, and the City will identify them with further particularity upon completion of its review of the City's and BFRS's records and following discovery.

274. To achieve their common goals, the PFAS Cover-Up Enterprise members hid from the public, fire departments, and others the dangers of PFAS.

### *D. Pattern of Racketeering Activity*

275. The predicate acts of mail fraud and wire fraud described above are related to one another. They share the same purpose—to sell PFAS-containing materials and PFAS Turnout Gear while concealing the hazards of PFAS; the same participants—the members of the PFAS Cover-Up Enterprise; the same victims—fire departments and municipal purchasers, including the City; the same methods of commission—the transmission by mail and wire of product literature, specifications, certifications, care instructions, bids, invoices, and public statements that affirmatively misrepresented the safety of the gear and omitted the presence and hazards of PFAS; and the same results—the sale of PFAS Turnout Gear that purchasers would not have bought, at prices they would not have paid, and the contamination of purchasers' property.

276. The predicate acts are continuous. They extended over a period of decades and continue to the present, and they constitute Defendants' regular way of conducting the business of designing, manufacturing, certifying, marketing, and selling Turnout Gear. The threat of continued racketeering activity persists for so long as Defendants continue to sell Turnout Gear without disclosing the hazards alleged herein.

### *E. Injury to Business or Property and Proximate Causation*

277. The City has been injured in its business and property within the meaning of 18 U.S.C. § 1964(c). Its injuries are concrete financial losses: the money it paid for PFAS Turnout Gear that was unfit and worth substantially less than the price paid; the costs of investigating, testing, and remediating its contaminated real and personal property; the costs of retrieving, destroying, and disposing of the PFAS Turnout Gear; and the costs of procuring replacement gear. The City's injuries are not derivative of, and do not flow from, any personal injury to any firefighter or other person.

278. The City's injuries were proximately caused by Defendants' violations of 18 U.S.C. § 1962(c). The City is the direct victim of the scheme: the object of the scheme was to induce fire departments and municipal purchasers, including the City, to purchase PFAS Turnout Gear without knowledge of the PFAS it contained, and the City's expenditures and property contamination are the direct and intended result. No independent factor accounts for the City's losses, no more directly injured party exists with respect to those losses, and no risk of duplicative recovery or complex apportionment arises from permitting the City to recover them.

279. The City purchased Turnout Gear directly from, or upon the direct solicitation of, one or more Defendants, including the Distributor Defendant. Upon information and belief, the City acquired Globe-branded Turnout Gear, and the Distributor Defendant solicited, sold, and delivered Turnout Gear to the City. To the extent any other Defendant designed, manufactured, assembled, or supplied Turnout Gear, or a PFAS-containing component or PFAS Chemical Finish incorporated into the Turnout Gear the City acquired, or solicited the City directly, the identity of each such Defendant is reflected in the City's procurement records and in Defendants' sales and supply records, and the City will identify each with further particularity upon completion of its review of those records and following discovery.

280. As to each Defendant from which the City did not purchase directly, that Defendant nonetheless directly and intentionally communicated with the City, or caused communications to be transmitted to the City, concerning the composition, performance, certification, care, and safety of the Turnout Gear and its components, including through product literature, specifications, technical data sheets, certification labels, product identification labels, care instructions, branded component designations, and marketing directed to fire departments. Those Defendants intended that the City rely on those communications in selecting and purchasing Turnout Gear, and the City did so rely. The City's injuries are therefore the direct result of those Defendants' own misrepresentations and omissions to the City, and not merely the consequence of a price increase passed along a chain of distribution.

281. The PFAS Cover-Up Enterprise members' conduct in furtherance of this scheme was intentional. The City was harmed as a result of the PFAS Cover-Up Enterprise members' intentional conduct.

282. As described herein, the PFAS Cover-Up Enterprise members engaged in a pattern of related and continuous predicate acts for many years, sharing the same or similar results, participants, victims, and methods of commission, all with the common purpose of defrauding the City.

283. The predicate acts all had the purpose of generating significant revenue and profits for the PFAS Cover-Up Enterprise members at the expense of the City.

284. The PFAS Cover-Up Enterprise members had a duty to disclose the truth about the dangers of PFAS-laden products to Turnout Gear manufacturers, consumers, and others but never did so. On information and belief, the City alleges that the PFAS Cover-Up Enterprise members never

disclosed the dangers of PFAS in PFAS-laden products in SDSs and Material Safety Data Sheets for PFAS-laden products that they sold to Turnout Gear manufacturers and others.

285. The PFAS Cover-Up Enterprise members' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused injuries and damages to the City, which is entitled to bring this action for three times its actual damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c). As a result of the conduct of the PFAS Cover-Up Enterprise, the City overpaid for Turnout Gear and was deprived of the ability to buy PFAS-free Turnout Gear.

## COUNT II
## RICO Conspiracy
## 18 U.S.C. §§ 1962(d), 1964(c)
## (Against All Defendants)

286. The City incorporates by reference and realleges each of the preceding paragraphs as if fully set forth herein.

287. Defendants conspired with one another, and with other members of the PFAS Cover-Up Enterprise, to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

288. Each Defendant knowingly agreed to the overall objective of the conspiracy—to conduct and participate in the affairs of the PFAS Cover-Up Enterprise through a pattern of mail fraud and wire fraud in order to sell PFAS-containing materials and PFAS Turnout Gear while concealing the hazards of PFAS—or knowingly agreed to commit, or to facilitate the commission of, the predicate acts that constitute that pattern.

289. Each Defendant's agreement is evidenced by, among other things, its participation in the coordinated data-sharing, supply, certification, standard-setting, marketing, and public-relations conduct described above; its adoption and transmission of the same misrepresentations and omissions concerning PFAS; its suppression of adverse data known to it; and its continued

manufacture, treatment, assembly, certification, distribution, and sale of PFAS Turnout Gear after acquiring knowledge of the hazards alleged herein.

290. The PFAS Cover-Up Enterprise members have not undertaken the practices described herein in isolation but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the PFAS Cover-Up Enterprise members conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third parties and individuals not named as defendants in this Complaint, have participated as co-conspirators with the PFAS Cover-Up Enterprise members in these offenses.

291. The PFAS Cover-Up Enterprise members aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

292. The PFAS Cover-Up Enterprise members, with knowledge and intent, agreed to the overall objectives of the PFAS Cover-Up Enterprise and participated in the common course of conduct to commit acts of fraud in designing, manufacturing, distributing, marketing, testing, and selling PFAS-laden products to Turnout Gear manufacturers.

293. As a direct and proximate result of Defendants' conspiracy and of the overt acts committed in furtherance of it, the City has been injured in its business and property as alleged above, and is entitled to recover threefold its damages, together with the costs of suit and reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

## COUNT III
**Alabama Extended Manufacturer's Liability Doctrine**
**Ala. Code §§ 6-5-501, 6-5-521**
**(Against All Defendants Except the Distributor Defendant)**

294. The City incorporates by reference and realleges each of the preceding paragraphs as if fully set forth herein.

295. This action is a "product liability action" within the meaning of Ala. Code §§ 6-5-501(2) and 6-5-521(a), and this Count is brought under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD").

296. This Count is not asserted against the Distributor Defendant. Under Ala. Code § 6-5-521(b), no product liability action may be asserted against a distributor, wholesaler, dealer, retailer, or seller of a product that is not also the manufacturer or assembler of the final product, unless that party exercised substantial control over the design, testing, manufacture, packaging, or labeling of the product, or altered or modified the product, and that act was causally related to the product's condition or was a substantial factor in causing the harm. The City therefore asserts this Count only against those Defendants that designed, formulated, treated, manufactured, assembled, or certified the PFAS Turnout Gear or the PFAS-containing components and PFAS Chemical Finishes incorporated into it.

297. The City's claims against the Distributor Defendant are asserted in Counts I, II, IV, V, VI, VII, VIII, IX, X, and XI, and rest upon Sunbelt's own independent acts and omissions — including its own misrepresentations and omissions to the City in bids, catalogs, specifications, and quotations, its own failure to communicate hazard information within its knowledge, and its own participation in the enterprise and conspiracy alleged herein — rather than upon its status as a seller of a product manufactured by another. Ala. Code § 6-5-521 protects a seller acting as a mere conduit for a product manufactured by another; it does not immunize a seller from liability for its own independent acts of negligence, wantonness, breach of warranty, or fraud.

298. At all relevant times, each Defendant was engaged in the business of designing, formulating, treating, manufacturing, assembling, certifying, distributing, supplying, or selling

PFAS Turnout Gear, or the PFAS-containing components or PFAS Chemical Finishes incorporated into PFAS Turnout Gear.

299. Each Defendant sold, supplied, or distributed the PFAS Turnout Gear, or a PFAS-containing component or PFAS Chemical Finish incorporated into it, and that product reached the City in substantially the same condition in which it left that Defendant's possession or control, without substantial change or alteration.

300. Each Defendant designed, manufactured, sold, or supplied a product that is identified, in the records and markings described above, as having been purchased, used, laundered, stored, or otherwise encountered by the City.

301. The PFAS Turnout Gear was in a defective condition that rendered it unreasonably dangerous when it left each Defendant's possession or control.

### *A. Defect in Design and Formulation*

302. The PFAS Turnout Gear was defective and unreasonably dangerous in its design and formulation because Defendants incorporated into it high concentrations of toxic, carcinogenic, and persistent PFAS, in multiple layers and through multiple applications, that Defendants knew would not remain bound within the gear but would migrate out of it during ordinary and foreseeable use, handling, laundering, and storage, and would thereby contaminate the property in and on which the gear was used and stored.

303. The PFAS Turnout Gear failed to perform as safely as an ordinary purchaser and user of firefighter protective equipment would expect when used in the manner intended and reasonably foreseeable, and its risks far outweighed any utility attributable to the PFAS it contained.

304. A safer, practical, technologically feasible, and economically reasonable alternative design existed at all relevant times, as alleged above: Turnout Gear constructed with non-fluorinated

outer-shell treatments and non-fluorinated moisture-barrier membranes, which satisfies the performance requirements applicable to structural firefighting ensembles without containing or releasing PFAS. Had Defendants adopted that alternative design, the contamination of the City's property would not have occurred and the City would not have been required to retrieve, destroy, and replace its Turnout Gear.

### ***B. Defect Arising from Inadequate Warnings and Instructions***

305. The PFAS Turnout Gear was independently defective and unreasonably dangerous because it was sold without adequate warnings or instructions. Defendants had a duty to warn purchasers and users of the latent dangers arising from the foreseeable use, handling, laundering, storage, and disposal of the gear.

306. Defendants failed to warn the City of any of the matters set forth in the section of this Complaint addressing Defendants' failure to provide adequate warnings, and further failed to instruct the City as to the specialized handling, laundering, containment, segregation, storage, and disposal protocols that PFAS-laden Turnout Gear requires.

307. Defendants had superior and in many respects exclusive knowledge of the toxicity of PFAS, of the propensity of PFAS to migrate out of Turnout Gear during ordinary use, and of the resulting risk of contamination of purchasers' property.

308. Any warnings Defendants might be said to have disseminated were rendered ineffective by Defendants' contrary public statements affirming the safety of PFAS in Turnout Gear, by their suppression of adverse data, and by their care and laundering instructions, which directed handling that Defendants knew would release PFAS.

309. Had Defendants provided legally adequate warnings and instructions, the City would have heeded them: it would not have purchased the PFAS Turnout Gear, would have purchased PFAS-

free gear or demanded that Defendants supply it, and would have implemented handling, laundering, containment, and disposal protocols that would have prevented or substantially limited the contamination of its property.

### *C. Causation and Damages*

310. At all relevant times the City used, handled, laundered, and stored the PFAS Turnout Gear in the manner intended and reasonably foreseeable, and in accordance with Defendants' instructions, and did not alter or misuse the gear.

311. The defective and unreasonably dangerous condition of the PFAS Turnout Gear directly and proximately caused physical injury to property of the City other than the Turnout Gear itself, as alleged in the section of this Complaint addressing the City's injuries and damages, and caused the City to incur the costs of investigation, testing, remediation, decontamination, repair, replacement, retrieval, destruction, and disposal alleged therein.

312. The City's claim under this Count is not limited to damage to the PFAS Turnout Gear itself. The PFAS migrated out of the gear and damaged separate and distinct property of the City that was not the subject of any sale by any Defendant to the City, including the City's station buildings, HVAC systems, apparatus, lockers, laundering equipment, furnishings, and grounds.

## COUNT IV
## Negligence
## (Against All Defendants)

313. The City incorporates by reference and realleges each of the preceding paragraphs as if fully set forth herein.

314. Each Defendant owed the City a duty to exercise reasonable care in the design, formulation, testing, manufacture, treatment, assembly, certification, labeling, marketing, distribution, and sale

of Turnout Gear and of the components and chemical finishes incorporated into it, and a duty to exercise reasonable care to warn of the dangers known or reasonably knowable to it.

315. Each Defendant breached that duty by, among other things: incorporating toxic and persistent PFAS into Turnout Gear in high concentrations when it knew or should have known that the PFAS would migrate out of the gear and contaminate purchasers' property; failing to test adequately for PFAS migration and for the resulting contamination; failing to warn or instruct purchasers, including the City, of the presence of PFAS, of its propensity to migrate, and of the handling, laundering, containment, and disposal protocols required; failing to design and offer PFAS-free Turnout Gear when it had the knowledge and technical ability to do so; failing to disclose adverse scientific data in its possession; and continuing to manufacture, certify, market, distribute, and sell PFAS Turnout Gear after acquiring knowledge of its dangers.

316. As to the Distributor Defendant, this Count is asserted only for Sunbelt's own independent acts and omissions, including its failure to exercise reasonable care in communicating to the City hazard, composition, care, laundering, containment, and disposal information within its knowledge or reasonably available to it, and not upon its status as a seller of a product manufactured by another.

317. Each Defendant's breach directly and proximately caused physical injury to property of the City other than the Turnout Gear itself, and caused the City to incur the damages alleged above.

## COUNT V
## Wantonness
## (Against All Defendants)

318. The City incorporates by reference and realleges each of the preceding paragraphs as if fully set forth herein.

319. Each Defendant's conduct alleged herein was wanton. Each Defendant acted, and failed to act, with reckless or conscious disregard of the rights and safety of the City and of the foreseeable consequences of its conduct, with knowledge of the existing conditions and conscious that injury would likely or probably result.

320. Each Defendant's wantonness is established by, among other things: its decades-long possession of internal toxicological data establishing that PFAS are toxic, persistent, bioaccumulative, and carcinogenic; its decision to withhold that data from purchasers, users, standard-setting bodies, and regulators; its adoption of protective measures for its own employees while withholding the basis for those measures from purchasers and users of its products; its affirmative public statements minimizing or denying hazards it knew to exist; its participation in a standard-setting process to entrench technical requirements that only PFAS-containing materials could satisfy; and its continued manufacture, certification, marketing, distribution, and sale of PFAS Turnout Gear for years after it knew the gear was unreasonably dangerous and after safer alternatives were available to it.

321. Each Defendant's wantonness directly and proximately caused the damages to the City alleged above. The City is entitled to recover punitive damages under Ala. Code § 6-11-20 by reason of Defendants' wantonness, and by reason of the fraud, malice, and oppression alleged in this Complaint.

**COUNT VI**
**Fraudulent Misrepresentation**
**Ala. Code §§ 6-5-100, 6-5-101**
**(Against All Defendants)**

322. The City incorporates by reference and realleges each of the preceding paragraphs as if fully set forth herein.

323. Defendants made false representations of material fact to the City, as described in the section of this Complaint addressing the representative misrepresentations and omissions made to the City, including representations that the Turnout Gear was safe and suitable for its intended use by a municipal fire department and for the wear, handling, laundering, and storage that such use entails, and representations affirming the safety of the PFAS in their products and materials.

324. Those representations were false when made. The Turnout Gear was laden with toxic PFAS that would migrate out of the gear during ordinary use and contaminate the City's property, and the PFAS in Defendants' products and materials were not safe.

325. Defendants knew their representations to be false when they made them, or made them recklessly without knowledge of their truth and as a positive assertion.

326. Defendants made those representations with the intention that the City and other fire departments rely upon them in specifying, selecting, bidding, purchasing, using, handling, laundering, and storing Turnout Gear.

327. The City reasonably relied upon Defendants' representations. It purchased the PFAS Turnout Gear, paid the prices Defendants and their distributors charged, and used, handled, laundered, and stored the gear in accordance with Defendants' instructions, in reliance on Defendants' representations that the gear was safe and suitable.

328. The City's reliance was reasonable. Defendants possessed superior and in material respects exclusive knowledge of the composition and hazards of the Turnout Gear; the presence, concentration, and migration of PFAS in the gear were not discoverable by the City through ordinary inspection or reasonable diligence; and Defendants' representations were reinforced by NFPA certification and by Defendants' public statements.

329. As a direct and proximate result of its reliance, the City suffered the damages alleged above.

**COUNT VII**
**Fraudulent Suppression**
**Ala. Code § 6-5-102**
**(Against All Defendants)**

330. The City incorporates by reference and realleges each of the preceding paragraphs as if fully set forth herein.

331. Each Defendant had knowledge of material facts that it suppressed and failed to communicate to the City, including: that the Turnout Gear and its components and finishes contained PFAS; the identity and concentration of the PFAS present; that the PFAS would migrate out of the gear during ordinary use, handling, laundering, and storage; that such migration would contaminate the City's stations, apparatus, equipment, laundering facilities, and other property; that PFAS are toxic, persistent, bioaccumulative, and carcinogenic; that PFAS contamination requires specialized and costly remediation, handling, and disposal protocols; that PFAS-laden gear cannot be resold, donated, or placed in ordinary solid waste; and that safer PFAS-free alternatives were technologically available.

332. Each Defendant was under an obligation to communicate those facts to the City. That obligation arose from the particular circumstances of the case, including: each Defendant's superior and in material respects exclusive knowledge of the composition and hazards of its products; the latent and undiscoverable nature of the PFAS content and migration; each Defendant's voluntary partial disclosures concerning the composition, performance, care, and safety of the Turnout Gear, which imposed a duty to disclose the whole truth; each Defendant's affirmative representations affirming the safety of the gear and of PFAS; the safety-critical nature of the product and the foreseeable consequences of nondisclosure; and the certification and

labeling representations through which each Defendant held the gear out as evaluated and suitable for structural firefighting use.

333. Each Defendant suppressed those facts with the intent to deceive the City and to induce it to purchase, use, handle, launder, and store the PFAS Turnout Gear.

334. The City was unaware of the suppressed facts and acted to its detriment in ignorance of them, by purchasing the PFAS Turnout Gear, paying the prices charged, and using, handling, laundering, and storing the gear in the manner Defendants instructed.

335. Had the suppressed facts been disclosed, the City would not have purchased the PFAS Turnout Gear, would not have paid the prices it paid, and would have implemented protocols that would have prevented or substantially limited the contamination of its property.

336. As a direct and proximate result of Defendants' suppression, the City suffered the damages alleged above.

**COUNT VIII**
**Negligent Misrepresentation**
**(Against All Defendants)**

337. The City incorporates by reference and realleges each of the preceding paragraphs as if fully set forth herein.

338. In the alternative to Counts VI and VII, and without waiving them, the City alleges that Defendants made the representations and omissions described above negligently, without exercising reasonable care to ascertain or communicate the truth concerning the composition, migration, and hazards of the PFAS in the Turnout Gear.

339. Defendants supplied that information in the course of their business and for the guidance of purchasers of Turnout Gear, including the City, in their business transactions, and Defendants

knew that municipal fire departments would rely upon it in specifying, bidding, and purchasing Turnout Gear.

340. The City justifiably relied upon that information, and as a direct and proximate result suffered the damages alleged above.

**COUNT IX**
**Trespass**
**(Against All Defendants)**

341. The City incorporates by reference and realleges each of the preceding paragraphs as if fully set forth herein.

342. The City owns and possesses the real property on which its fire stations, apparatus bays, laundering facilities, and grounds are located.

343. Defendants caused PFAS—a toxic, persistent, and indestructible chemical substance—to enter, invade, and remain upon the City's real property, in the form of dust, particulates, off-gassed vapor, abraded fibers and coatings, wash water, and wastewater released from the PFAS Turnout Gear that Defendants designed, manufactured, treated, assembled, certified, distributed, and sold for use and storage on that property.

344. Defendants' invasion of the City's property was indirect but was intentional in the legal sense: Defendants knew, with substantial certainty, that the PFAS they incorporated into the Turnout Gear would migrate out of the gear during the ordinary use, handling, laundering, and storage that Defendants intended and instructed, and would come to rest upon and within the property of the fire departments that purchased the gear. Defendants intended the conduct that caused the invasion and knew that the invasion would result.

345. The invasion was not consented to by the City. The City consented to the presence on its property of protective equipment fit for firefighting; it did not consent, and could not have

consented, to the deposit of toxic PFAS upon and within its buildings, systems, apparatus, and grounds, the presence of which Defendants concealed from it.

346. The invasion caused substantial damage to the City's property, including the contamination described above, the diminution in the value and usability of the affected property, and the necessity of investigation, testing, remediation, decontamination, repair, and replacement.

347. The invasion is continuing. PFAS deposited upon and within the City's property persists there and will persist indefinitely absent remediation, and additional PFAS continues to be released so long as the PFAS Turnout Gear remains on the property.

348. As a direct and proximate result of Defendants' trespass, the City suffered the damages alleged above.

**COUNT X**
**Civil Conspiracy**
**(Against All Defendants)**

349. The City incorporates by reference and realleges each of the preceding paragraphs as if fully set forth herein.

350. Defendants combined and agreed with one another, and with others, to accomplish unlawful purposes and to accomplish lawful purposes by unlawful means, namely: to conceal from fire departments, municipal purchasers, standard-setting bodies, regulators, and the public the toxicity of PFAS, the presence and concentration of PFAS in Turnout Gear, and the propensity of PFAS to migrate out of Turnout Gear and contaminate surrounding property; to suppress adverse scientific data concerning PFAS; to make and disseminate misrepresentations concerning the safety of PFAS and of PFAS Turnout Gear; and to entrench within the standard-setting process technical requirements that only PFAS-containing materials could satisfy.

351. Each Defendant knowingly joined that combination and agreement. The existence and terms of the agreement are established by, among other things, the decades-long exchange of toxicological data between 3M and DuPont; the suppression of the February 1997 cancer-warning material safety data sheet described above; the coordinated supply, certification, and marketing relationships along the Turnout Gear supply chain; joint participation in industry associations and trade groups; joint participation in and coordinated advocacy within the NFPA technical committee process; the retention and use of shared consultants to publish statements minimizing the hazards of PFAS in Turnout Gear; and the substantial uniformity of Defendants' public statements and of their omissions concerning PFAS in Turnout Gear.

352. Defendants committed overt acts in furtherance of the conspiracy, including each of the acts of misrepresentation, suppression, concealment, standard-setting advocacy, manufacture, certification, marketing, distribution, and sale alleged in this Complaint.

353. The underlying wrongs that Defendants conspired to commit and did commit—fraudulent misrepresentation, fraudulent suppression, wantonness, negligence, trespass, and liability under the AEMLD—are actionable in themselves, as alleged in the preceding Counts.

354. Each Defendant is jointly and severally liable for all damage caused by the conspiracy, without regard to the extent of its individual participation, as a direct and proximate result of which the City suffered the damages alleged above.

**COUNT XI**
**Unjust Enrichment**
**(Against All Defendants)**

355. The City incorporates by reference and realleges each of the preceding paragraphs as if fully set forth herein.

356. In the alternative to the preceding Counts, and without waiving them, the City alleges that it conferred a benefit upon each Defendant in the form of the monies the City paid, directly or through Defendants' distributors, for PFAS Turnout Gear and for the PFAS-containing components and PFAS Chemical Finishes incorporated into it, a portion of which monies each Defendant received.

357. Each Defendant appreciated and had knowledge of that benefit, and accepted and retained it.

358. Each Defendant obtained that benefit through the misrepresentation, suppression, and concealment alleged in this Complaint, and by avoiding the costs it would have incurred had it developed, adopted, and supplied PFAS-free Turnout Gear or disclosed the hazards of the gear it sold.

359. Under the circumstances, it would be inequitable and unconscionable for Defendants to retain that benefit. The City is entitled to restitution and disgorgement of the monies by which Defendants were unjustly enriched, including the amounts the City paid for PFAS Turnout Gear and the costs Defendants avoided at the City's expense, together with the imposition of a constructive trust upon those amounts.

**COUNT XII**
**Fraudulent Transfer**
**6 Del. C. §§ 1304, 1305, 1307**
**(Against the DuPont Defendants)**

360. The City incorporates by reference and realleges each of the preceding paragraphs as if fully set forth herein.

361. The City is a creditor holding a claim against EIDP within the meaning of 6 Del. C. § 1301, and its claim arose from EIDP's design, manufacture, marketing, and sale of the PFAS and PFAS Chemical Finishes incorporated into the Turnout Gear the City purchased. Under 6 Del. C. §

1304(a), a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor, or without receiving reasonably equivalent value in exchange where the debtor was engaged in or about to engage in a business for which its remaining assets were unreasonably small, or intended to incur or should have believed it would incur debts beyond its ability to pay as they became due.

362. Upon information and belief, the DuPont Defendants engaged in a series of transactions restructuring DuPont for the purpose of shielding assets from creditors holding claims arising from PFAS, including the City. At the time of that restructuring, DuPont knew that its PFAS-related liabilities were likely in the billions of dollars.

363. In the first step, DuPont formed Chemours in 2015 as a wholly owned subsidiary and, in July 2015, spun Chemours off, transferring to it DuPont's Performance Chemicals unit together with a vast amount of environmental liabilities, including those relating to PFAS. As part of that transaction, Chemours transferred valuable consideration to DuPont, including a dividend of approximately $3.9 billion to DuPont stockholders, for which Chemours incurred additional debt.

364. Upon information and belief, the Chemours spin-off was not bargained at arm's length. Although Chemours had a separate board at the time of the spin-off, it was controlled by DuPont personnel.

365. Upon information and belief, DuPont transferred to Chemours a disproportionately small allocation of assets relative to the debts and liabilities Chemours assumed. DuPont transferred less than twenty percent of its business lines but more than sixty-six percent of its environmental liabilities and approximately ninety percent of its pending litigation, in addition to the debt

Chemours incurred to fund the dividend to DuPont's shareholders. Chemours therefore did not receive reasonably equivalent value in exchange for the debts and obligations transferred to it.

366. In its valuation, DuPont purposefully understated the maximum potential liability associated with the PFAS liabilities it transferred. At the time of the spin-off DuPont had been sued, had been threatened with suit, and had knowledge of forthcoming litigation concerning its liability for injuries and damages arising from the manufacture, sale, and use of PFAS-containing products. DuPont and Chemours knew or should have known that Chemours would incur debts beyond its ability to pay as they became due.

367. In further restructuring, DuPont merged with The Dow Chemical Company and then separated the combined assets among three newly created companies: DowDuPont, Inc., which later became DuPont de Nemours; Dow, Inc.; and Corteva. Upon information and belief, following the merger DowDuPont undertook an internal reorganization the net effect of which was to transfer a substantial portion of valuable assets for less than their worth, with the intent to frustrate and hinder creditors holding claims against DuPont, including claims relating to PFAS.

368. On or about June 1, 2019, the DuPont Defendants completed the restructuring by spinning off Corteva and Dow, Inc. Assets associated with the agriculture business were allocated to Corteva; assets associated with the material science business were allocated to Dow, Inc.; and assets associated with the specialty products business remained with the entity that became DuPont de Nemours. EIDP became a wholly owned subsidiary of Corteva. Upon information and belief, Corteva and DuPont de Nemours assumed responsibility for some of EIDP's historic PFAS liabilities, and EIDP's assets were transferred to Corteva and DuPont de Nemours for substantially less than their actual value, with EIDP divesting approximately half of its tangible assets.

369. The net result of the restructuring was to move DuPont's extensive PFAS liabilities to an underfunded entity, Chemours, and to shield DuPont's assets by combining them with Dow's and then transferring them to Corteva and DuPont de Nemours for substantially less than their value.

370. The DuPont Defendants made these transfers and incurred these obligations with actual intent to hinder, delay, and defraud creditors holding PFAS-related claims, including the City, and without the transferors receiving reasonably equivalent value in exchange, at a time when the remaining assets available to satisfy PFAS-related claims were unreasonably small in relation to the liabilities retained and when the DuPont Defendants knew or should have believed that those liabilities could not be paid as they became due.

371. The City has been harmed by these transactions, which were designed to place assets beyond the reach of creditors such as the City. The City is entitled to avoidance of the transfers to the extent necessary to satisfy its claim, to attachment of the assets transferred, to a judgment for the value of the assets transferred, and to such other relief as the circumstances may require, under 6 Del. C. §§ 1307 and 1308. The City pleads this Count under Delaware law because the alleged transferors and transferees are Delaware entities and the challenged corporate restructurings involve Delaware-centered corporate relationships and transactions. In the alternative, and only to the extent discovery establishes materially greater Alabama contacts to a particular transfer, the City pleads the Alabama fraudulent-transfer statutes as set forth in Count XIII. The City did not discover, and could not reasonably have discovered, the facts supporting its claim that the restructuring was made with actual intent to hinder, delay, or defraud PFAS creditors until recently. This action was commenced within one year after that discovery. The City further alleges that Defendants' restructuring prevented earlier discovery of the transfer's alleged fraudulent purpose and effect.

**COUNT XIII**
**Fraudulent Transfer Under Alabama Law,**
**Pleaded in the Alternative**
**(Against the DuPont Defendants)**

372. The City incorporates by reference and realleges each of the preceding paragraphs as if fully set forth herein.

373. This Count is pleaded in the alternative to Count XII. The City alleges that Alabama law applies to any challenged transfer for which the relevant creditor relationship, injury, property, conduct, transaction, or other materially significant contacts are centered in Alabama.

374. As to any transfer made before January 1, 2019, the City asserts this Count under the Alabama Uniform Fraudulent Transfer Act. As to any transfer made on or after January 1, 2019, the City asserts this Count under the Alabama Uniform Voidable Transactions Act. Alabama's current statute expressly applies only to transfers made on or after January 1, 2019, while the prior statute applies to earlier transfers. Code of Ala. § 8-9B-16 (2019).

375. The City alleges that the City's purchase, use, laundering, storage, and resulting property contamination in Alabama supports application of Alabama law to the extent the Court determines that Alabama has the most significant relationship to a particular challenged transfer.

376. The DuPont Defendants made the transfers and incurred the obligations alleged in paragraphs 362 through 370 with actual intent to hinder, delay, or defraud the City and other PFAS-related creditors, and without reasonably equivalent value under circumstances that left the relevant debtor unable adequately to satisfy known or reasonably foreseeable liabilities.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff City of Birmingham, Alabama respectfully requests that this Court enter judgment in its favor and against Defendants, jointly and severally, and award the following relief:

A. Compensatory damages for physical injury to and contamination of the City's real and personal property, in an amount to be determined at trial;

B. Damages for the costs of investigating, sampling, testing, remediating, decontaminating, repairing, and replacing the City's contaminated real and personal property, in an amount to be determined at trial;

C. Damages for the costs of treating and disposing of PFAS-contaminated wash water and wastewater, in an amount to be determined at trial;

D. Damages for the costs of retrieving, containing, transporting, destroying, and lawfully disposing of the PFAS Turnout Gear, in an amount to be determined at trial;

E. Damages for the costs of procuring replacement Turnout Gear that is free of PFAS and fit for its intended purpose, in an amount to be determined at trial;

F. Damages measured by the amounts the City paid for PFAS Turnout Gear that was unfit, unreasonably dangerous, and worth substantially less than the price paid, in an amount to be determined at trial;

G. Damages for the costs of developing and implementing specialized handling, laundering, containment, segregation, and storage protocols for PFAS Turnout Gear remaining in service pending replacement, in an amount to be determined at trial;

H. Threefold the City's damages sustained by reason of Defendants' violations of 18 U.S.C. § 1962(c) and (d), together with the costs of suit and reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c);

I. Restitution and disgorgement of all amounts by which Defendants were unjustly enriched, and the imposition of a constructive trust upon those amounts;

J. Punitive damages in an amount sufficient to punish Defendants and to deter Defendants and others similarly situated from like conduct in the future;

K. An order requiring Defendants to abate the continuing contamination of the City's property, including by retrieving, transporting, destroying, and lawfully disposing of the PFAS Turnout Gear at Defendants' expense and remediating the City's contaminated property at Defendants' expense;

L. Avoidance of the transfers described in Counts XII and XIII to the extent necessary to satisfy the City's claim, attachment of the assets transferred, and judgment against the DuPont Defendants for the value of the assets transferred, pursuant to 6 Del. C. §§ 1307, 1308, and/or Ala. Code §§ 8-9A-1 et seq. and 8-9B-1 et seq.;

M. Pre-judgment and post-judgment interest as allowed by law;

N. The City's costs and expenses of this action, including expert fees and attorneys' fees as allowed by law; and

O. Such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff City of Birmingham, Alabama demands a trial by jury on all issues triable of right by a jury.

Dated: September 22, 2026

Respectfully Submitted,

ENVIRONMENTAL LITIGATION GROUP, P.C.

/s/ Gregory A. Cade
Gregory A. Cade
Gary A. Anderson
Kevin B. McKie
ENVIRONMENTAL LITIGATION GROUP, P.C.

2160 Highland Avenue South
Birmingham, AL 35205
Telephone: 205-328-9200
Facsimile: 205-328-9456

Counsel for Plaintiff City of Birmingham, Alabama